UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHABTIR SCOTT SHATSKY, et al      :
                                  :
         Plaintiffs            :
                                    :     08 cv 496(RJL)
        v.                    :
                                    :
SYRIAN ARAB REPUBLIC, THE      :
SYRIAN MINISTRY OF DEFENSE, MUSTAFA  :
TLASS, SYRIAN MILITARY INTELLIGENCE,  :
HASSAN KHALIL, ASSEF SHAWKAT,     :
ALI DOUBA, THE SYRIAN AIR FORCE    :
INTELLIGENCE DIRECTORATE and     :
IBRAHIM HUEIJI,               :
                                  :
         Defendants.        :
_____:

## THE SYRIAN ARAB REPUBLICS  MOTION UNDER FED.R.Civ. P 12(b) TO DISMISS THE COMPLAINT FILED ON MARCH 21, 2008

The defendant Syrian Arab Republic, three additional Syrian governmental defendants and five Syrian defendants, who are  individuals who have not been served in this action, move pursuant to Fed.R.Civ. P. 12(b) for dismissal of this action against them for lack of subject matter jurisdiction, based on Syria's sovereign immunity and right to equal sovereignty, the non-justiciability of the  political questions presented, the unconstitutional lack of finality of the judgments rendered by Article III Courts in cases under FSIA §§1605(a)(7) and 1605A and the absence of a sufficient nexus and causation to establish subject matter jurisdiction, the failure to accord defendants due process of law, fundamental fairness and other rights in violation of the U.S. Constitution and laws and  treaties, conventions and customary international law;  for lack

of personal jurisdiction, for failure to state a claim upon which relief can be granted in pleading non-

federal causes of action and on other grounds developed in the supporting memorandum filed with

this motion..

Dated: New York, NY                    Respectfully submitted,

    June 22, 2009                             /s/
                                  Ramsey Clark DC Bar No. 73833
                                            /s/
                                  Lawrence W. Schilling
                                  37 W. 12 th St.
                                  New York, NY 10011
                                  212-989-6613 fax 212-979-1583
                                  email: lwschilling@earthlink.net

                                  Attorneys for the Syrian Arab Republic

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHABTIR SCOTT SHATSKY, et al | : | |
| | : | |
| Plaintiffs | : | |
| | : | 08 cv 496(RJL) |
| v. | : | |
| | : | |
| SYRIAN ARAB REPUBLIC, THE | : | |
| SYRIAN MINISTRY OF DEFENSE, MUSTAFA | : | |
| TLASS, SYRIAN MILITARY INTELLIGENCE, | : | |
| HASSAN KHALIL, ASSEF SHAWKAT, | : | |
| ALI DOUBA, THE SYRIAN AIR FORCE | : | |
| INTELLIGENCE DIRECTORATE and | : | |
| IBRAHIM HUEIJI, | : | |
| | : | |
| Defendants. | : | |

**THE SYRIAN ARAB REPUBLICS  MEMORANDUM  OF  POINTS
AND AUTHORITIES IN SUPPORT OF SYRIA'S  RULE 12(b) MOTION
TO DISMISS THE COMPLAINT FILED ON MARCH 21, 2008**

Ramsey Clark
Lawrence W. Schilling
37 West 12th Street, 2B
New York, NY 10011
212-989-6613
212-979-1583 fax
lwschilling@earthlink.net

Attorneys for the Syrian Defendants

# Table of Contents

Page

**Preliminary Statement**     1

**Argument**     6

I.    **Article 2 Of The United Nations Charter Requires All Members To Act In Accordance With the Principle of Sovereign Equality On Which The U.N. Is Based And to Fulfill In Good Faith Their Obligation To Ensure The Sovereign Equality Of Each Member**     6

A.    **FSIA §1605(a)(7), as applied, Violates the Sovereign Equality and the Juridical Equality of the Syrian Arab Republic and the Obligation of the U.N. and Each of its Members to Ensure the Sovereign Equality of all U.N. Members by Seeking to Subject the Syrian Arab Republic to the Coercive Power of U.S. Courts for Alleged Acts of State in Violation of FSIA 1605(a)(7), While Recognizing the Sovereign Immunity of Nearly all Other U.N. Members from Suits for Violations of §1605(a)(7)**     6

B.    **Congress Did Not Intend to Violate the First Principle of the U.N. Charter – The Sovereign Equality of Nations -- by Enacting the FSIA Provisions**     20

C.    **Designations under Section 1605(a)(7) by Violating the Equal Sovereignty of U.N. Members Designated State Sponsors of Terrorism Have Seriously Impaired Efforts to End of the Scourge of War, Harmed the Peoples of the United Nations, Damaged the United States in the Conduct of Its Foreign Relations and Assaulted the Foreign States it has Unilaterally Labeled Terrorist and Attempted to Selectively Hold Subject to the Jurisdiction of U.S. Courts**     23

D.    **The Power of the U.S. Secretary of State under FSIA §1605(a)(7) to Designate a Foreign State a Sponsor of Terrorism and the Procedures Followed are Lawless, Antithetical to the Rule of Law and Endanger the Independence of the Federal Judiciary.**     25

II.    **The Syrian Arab Republic has Responded in this Case as a Courtesy to the United States Hoping that by Reasoning Together in U.S. Courts this Harmful and Unlawful Practice can be Ended and a Step Toward Better Relations Taken**.     27

III.    **This Case Presents Non-Justiciable Political Questions**     29

**IV.**   **FSIA §§1605(a)(7) and 1605A Exposes the Finality of
          Judgments of Article III Courts, an Essential Attribute of
          Judicial Power, to Legislative and Executive Nullification and
          Are Unconstitutional**                                              42

**V.**    **The complaint's allegations that Syria provided massive support and
          resources of all  kinds for a terrorist shooting in 1991 and a terrorist
          bombing in 2002 allegedly committed by the PLO are general,
          conclusory and boilerplate, and are inadequate to provide the nexus
          and causation between the alleged general support and the two violent
          events at issue required to establish  jurisdiction under FSIA §§1605A
          and 1605(a)(7).**                                                   48

**Conclusion**                                                                54

## Preliminary Statement

This memorandum is submitted by the Syrian Arab Republic in support of its Rule 12(b)

motion to dismiss the claims against it and the eight other Syrian defendants  in the complaint

filed herein on March 21, 2008.   The Rule 12(b) motion seeks dismissal for lack of subject

matter jurisdiction, based on Syria's sovereign immunity and equal sovereignty, the non-

justiciability of the  political questions presented, the unconstitutional lack of finality of the

judgments rendered by Article III Courts in cases under FSIA §§1605(a)(7) and 1605A and the

failure to accord defendants due process of law, fundamental fairness and other rights in

violation of the U.S. Constitution and laws and  treaties, conventions and customary international

law;  for lack of personal jurisdiction, for failure to state a claim upon which relief can be

granted  and other grounds set forth below.

This case was originally filed in this Court on November 18, 2002, as 02cv2280(RJL).

The original complaint sought money damages for injuries resulting from the detonation of an

explosive device by a suicide bomber at a pizzeria in the West Bank of Palestine on February 16,

2002.  This was at the height of violence during the second intifada which began in late

September 2000.   The original complaint named as defendants the Palestinian Authority and the

Palestine Liberation Organization, sued under the Anti-Terrorism Act of 1991, 18 U.S.C. §2331

et seq., for allegedly planning and carrying out the bombing, and in conclusory allegations, the

Syrian Arab Republic and eight of its departments and officials,  under the Foreign Sovereign

Immunities Act, 28 U.S.C. §1602 et seq., for allegedly  providing a wide range of general

support for terrorism by the PA and PLO   No acts by the Syrian defendants directly connected

to the violence at issue has been alleged at any stage of this case to date,  and no nexus or causal

1

link has been alleged between the allleged massive general support and the violence, except in conclusory terms with no actual details.

On February 7, 2005, in case 02cv2289, the Court denied a Rule 12(b) motion by the PA and PLO in a minute order without opinion.

No answer was thereafter filed by the PA and PLO and on April 12, 2005 at Plaintiffs request the Clerk entered the default of the PA and PLO.

On April 15, 2005, Syria filed a Rule 12(b) motion to dismiss the complaint.

Syria's Rule 12(b) motion was pending unanswered when plaintiffs on May 2, 2005 filed a Voluntary Notice of Dismissal under Fed.R.Civ.P 41(a)(1)(i) dismissing all nine Syrian defendants, without prejudice.  The Court by minute order on January 25, 2006 <u>sua</u> <u>sponte</u> dismissed Syria's Rule 12(b) motion as moot.

In their May 2, 2005, Notice of Voluntary Dismissal plaintiffs recited that default judgment would soon be entered in their favor against the PA and PLO whose default had been entered by the Clerk, and  explained that the elimination of the Syrian defendants would  avoid any delay in the entry of final judgment against the PA and PLO that might be required by Fed.R.Civ.P. 54(b) if other defendants remained in the case with claims pending against them. The Notice concluded: "Plaintiffs will file a new action against the dismissed defendants shortly," and will identify the new action as related to the first.   This method of creating appellate jurisdiction is questionable but has not been pur in issue to date.

Contrary to the Notice, the new complaint against the dismissed Syrian defendants was not filed "shortly."  It was filed just shy of a year later, on April 21, 2006, 06cv724.   Its allegations concerning the bombing at the pizzeria were virtually identical to those of the

original complaint.  However there were two significant differences between the new complaint and the old.

(1)  The :new complaint sought damages against the eight Syrian defendants other than Syria in their personal capacities.  The original complaint alleged claims against these defendants only in their official capacity.

(2)  An entirely unrelated incident of violence was added to the case -- the alleged fatal shooting on March 26, 1991 of a motorist driving in the West Bank, more than 15 years earlier. No explanation was given for the delay in asserting this claim which was filed a few days before the expiration of the ten year period following the addition of the terrorism exception to the FSIA on April 24, 1996.  This new shooting added two  plaintiffs to the case, the driver's widow and a friend, alleged to have happened upon the scene minutes after the shooting.   The two incidents of violence at issue in this case are referred to throughout by plaintiffs as the "terrorist bombing" and the 'terrorist shooting."   The new April 21, 2006 complaint applied  the same general allegations of massive general support and resources to both the shooting in 1991 and the bombing in 2002.

On December 7, 2006, Syria filed a Rule 12(b) motion to dismiss the new April 21, 2006 complaint in case 06cv724(RJL) based on defects in the service of process plaintiffs had purported to make by diplomatic note through the U.S. Embassy pursuant to FSIA §1608(a)(4). Among other defects in this service, plaintiffs had the wrong complaint translated into Arabic and included in the papers served and plaintiffs also included an outdated 1988 version of the Foreign Sovereign Immunities Act, without the required translation into Arabic.  Plaintiffs did not oppose the motion based on defective service.   They submitted new papers to the State

3

Department and requested service anew under FSIA §1608(a)(4).

On August 27,  2007, Syria filed a Rule 12(b) motion again seeking dismissal of the April 21, 2006 complaint.   Without responding to the motion, on October 24, 2007,  plaintiffs filed a First Amended Complaint (FAC), without leave of the Court and over Syria's objection that the FAC was the third complaint plaintiffs had filed so that leave of the Court needed to be obtained.  Syria expressed concern that if the FAC was filed as of right, plaint;iffs might well add new parties and additional unrelated claims, as they had done in their second complaint. Without obtaining leave, plaintiffs filed the FAC, again mooting a pending Rule 12(b) motion by Syria..  Syria then filed a new Rule 12(b) motion, its fourth, which it did on November 26, 2007. A briefing schedule for the motion was set, with plaintiffs response due on January 2, 2008.

Instead of opposing the motion, plaintiffs on December 28, 2007 moved for a stay apprising the Court of the passage by Congress of new FSIA amendments, included in one section, §1083, of a large Appropriations Bill.  As far as publicly appeared, the FSIA amendments received little if any legislative study or consideration at any session of  committees or at hearings or on the floor of Congress.   The amendments were arbitrary and punitive, so much so that President Bush refused to sign the Appropriations bill  on the ground it would be ruinous to Iraq, a designated sponsor of terrorism, but viewed in 2007 as a friendly nation. President Bush subjected the Appropriations Bill to a pocket veto, and it was not enacted.   On January 28, 2008 Section 1083 was included in a new Appropriations Bill without change other than the addition of a waiver power authorizing the President to make §1083 inapplicable to Iraq, which he did the same day he signed the bill.

Plaintiffs two days later, on January 30, 2008 filed a notice of "superceding legislation"

in this action and asked for time to consider how they would seek to proceed under §1605A of the new legislation, i.e. by seeking to amend their §1605(a)(7) complaint to state claims under §1605A or by filing a new §1605(A) action.

Plaintiffs decided to proceed in both ways, by motion in 06cv724 and by filing a new action. The Court denied the motion which was defective in several respects. Plaintiffs filed their new action in this Court on March 21, 2008, 08cv496(RJL) in which this Rule 12(b) motion by Syria is being made.

Less than a week later, plaintiffs filed a Notice of Pending Action under §1605A(g)(1), one of the FSIA amendments enacted on January 28, 2008 and to protect the security interest plaintiffs believed they had thus created in their favor, plaintiffs sought to intervene, thus far unsuccessfully, in another action in this Court against Syria, the <u>Gates</u> case, 06cv1500(RMC) to assert priority of their liens on Syria's assets which §1605A(g) grants in the amount demanded in the complaint, over a billion dollars in this case, claiming priority over any claims arising from the <u>Gates</u> default judgment of over $400,000, entered in September 2008, about six months after the Notice of Pending Action were filed by plaintiffs in January 2008.

At the outset of this case, after it was originally filed in November 2002, the undersigned attorneys appeared as counsel for all defendants, Palestinian and Syrian. In May 2007 the PA and PLO retained new counsel for the several cases against them in U.S. courts. New counsel appeared in case 02cv2280(RJL) for the PA and PLO. With leave of the Court, the undersigned then formally withdrew from representation of the PA and PLO in that case, and counsel's representation of the Syrian defendants continued on the claims being asserted against Syria in case 06cv724(RJL) and 08cv476(RJL)

5

Until a letter from the State Department was entered on the docket on June 22, 2009, with a filing date of June 18, 2009, there was no proof of service of process on the docket.  The DOS letter stated that service had been made on April 2, 2009 on Syria and the three governmental defendants and apologized for the letter's delay.  We understand that no service has been attempted by the State Department or accomplished on the five Syrian defendants who are individuals and have been defendants since this case was filed in November 2002, except for the hiatus from May 2, 2005 to April 21, 2006 when no action by plaintiffs was pending against Syria.   Since there has been no claim of service of process on the five defendants who are individuals, dismissal of the case against them is appropriate and is  requested by Syria at this time.

**Argument**

I.     **Article 2 Of The United Nations Charter Requires All Members To Act In Accordance With the Principle of Sovereign Equality On Which The U.N. Is Based And to Fulfill In Good Faith Their Obligation To Ensure The Sovereign Equality Of Each Member**

A.     **FSIA §1605(a)(7), as applied, Violates the Sovereign Equality and the Juridical Equality of the Syrian Arab Republic and the Obligation of the U.N. and Each of its Members to Ensure the Sovereign Equality of all U.N. Members by Seeking to Subject the Syrian Arab Republic to the Coercive Power of U.S. Courts for Alleged Acts of State in Violation of FSIA 1605(a)(7), While Recognizing the Sovereign Immunity of Nearly all Other U.N. Members from Suits for Violations of §1605(a)(7)**

Chapter I of the U.N. Charter, entitled "Purposes and Principles", contains only two articles.

Article 1 declares "The purposes of the U.N. are:

"1.  To maintain international peace and security...
"2   To develop friendly relations among nations...

6

"3   To achieve international co-operation...
"4   To be a center for harmonizing the actions of nations..."

Article 2 declares the Principles of the U.N.  It begins

"The Organization and its Members, in Pursuit of the Purposes stated in Article 1, shall act  in accordance with the following Principles.
    "1.  The Organization is based on the principle of the sovereign equality of all its Members.
    "2.   All Members, in order to ensure to all of them the rights and benefits resulting from membership, shall fulfill in good faith the obligations assumed by them in accordance with the present Charter."

To remove any doubt that all U.N. Members are bound to honor the Principle of Sovereignty Equality on which the U.N. is based, the first sentence of Article 2 directs that Members of the U.N. "...shall act in accordance with the following Principles" and Article 2(2) which immediately follows Article 2(1) directs that all Members "...shall fulfill in good faith obligations assumed by them in accordance with the present Charter."

Long before the drafting of the U.N. Charter, its first principle – the sovereign equality of all nations – was an axiom of international law.   Benedict Kingsbury, Sovereignty and Inequality, 9 European J. Int'l Law 599, 603 (1998).

The attempted exercise of judicial power by one sovereign over the body politic, ministries, agencies, or officials of another sovereign for governmental acts within its own territory, or elsewhere outside the territory of the sovereign seeking to coerce it by the exercise of judicial power, is a direct assault upon the sovereignty of that government and where exercised selectively violates the principles of sovereign equality and juridical equality protected by the U.N. Charter, U.N. declarations, other multinational and bilateral treaties and by customary international law.

The threat or use of judicial power to compel conduct, such as the compulsion of

7

testimony from government officials or personnel, or the surrender or seizure of official papers, or property of a foreign sovereign nation based on acts of that foreign sovereign within its own country, or elsewhere outside the territory of the sovereign seeking to employ such force is a provocative  violation of its sovereignty.

For more than two centuries, until the 1996 amendments to the FSIA, the U.S. recognized the sovereign equality of nations and refused to exercise jurisdiction over foreign states for violence and other tortious acts where death or injury resulted outside the U.S.  See, sec. 454(a) Restatement of the Law (Third), the Foreign Relations Law of the United States (ALI).  A painful and humiliating example involved the U.S. Embassy personnel forcibly held in Tehran in the history changing hostage crisis of 1979-81.   U.S. Embassy personnel were denied relief on claims for damages against Iran brought in U.S. courts because Iran had sovereign immunity. See Persinger v. Islamic Republic of Iran, 729 2d 835 (D.C. Cir. 1984), cert denied 469 U.S. 881 (1984).   After enactment of the 1996 terrorism exception, FSIA §1605(a)(7), the U.S. Embassy hostages tried again to recover for their injuries only to fail because of the 1980 Algiers Accors, a bilateral treaty between the U.S. and Iran by which their release was secured which prohibited such an action.  See Roeder v. Islamic Republic of Iran, 333 F.3d 228 (D.C. Cir. 2003)

The legislative denial of sovereign immunity to a few selected nations is a hostile act and can be extremely costly and provocative.  For a sovereign, or its officials to be hailed into a foreign court for alleged governmental acts on their nation's own soil, or elsewhere outside the territory of the demanding government, is to be asked to submit to the supremacy of another sovereign for acts in other parts of the world on the soil of other sovereigns and if complied with, potentially forced to provide testimony by high officials, surrender and expose state secrets and

8

confidential information and forfeit hundreds of millions even billions of dollars however impoverished its own citizens may be.

The enormous judgments entered by U.S. courts in cases against selected sovereign nations including impoverished peoples are beyond imagination elsewhere in the world, and further inflame anti American passions.  They invite retaliation and response in kind.  The Department of State itself, whose employees were held hostage in Tehran, has often vigorously opposed such selective violations of sovereign immunity as contrary to law and important foreign policy interests of the U.S.  The unprecedented addition of punitive damages against foreign sovereigns creating the right of U.S. citizens to punish foreign sovereigns through U.S. courts, compounds the assault on equal sovereignty.  See FSIA §1605A(c), enacted January 28, 2008.

The equal sovereignty of every nation is the necessary and rightful foundation of the law of nations.  No other standard could achieve the acceptance of all nations to the mandate of international law.

Such selective denials of equal sovereignty also violate the third principle of the U.N. that "All Members shall settle their international disputes by peaceful means in such a manner that international peace and security, and justice, are not endangered." Article 2.3, U.N. Charter.

The moral force and legal assurance of the equal sovereignty of nations is as compelling for peaceful relations among nations as the principle of the equality of every person is to domestic tranquility and the protection of the human rights of individuals.  Equal sovereignty is the foundation for relations among States just as the equality in dignity and rights of individuals is the foundation for the relations between the State and the individual.

9

The Preamble of the Universal Declaration of Human Rights begins "Whereas recognition of the inherent dignity and the equal and unalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world." Article 1 of the Declaration declares "All human beings are born free and equal in dignity and rights."

Article 2(1) of the International Covenant on Civil and Political Rights, to which the United States is a Party proclaims

"Each State Party to the present Covenant undertakes to respect and to insure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant, without distinction of any kind, such as race, color, sex, language, religion, political or other opinion, national or social origin, property, birth, or other status."

The principles of the U.N. Charter, like those of the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights are woven into the fabric of international law, including treaties, agreements, the charters and acts of international organizations and customary international law.

The Charter of the Organization of American States, which the United States has ratified and in which it remains a Member, proclaims itself "a regional agency", "Within the United Nations". Article 1. In Article 3, it provides

"The American States reaffirm the following principles:

(a) International law is the standard of conduct of States in their reciprocal relations;

(b) International order consists essentially of respect for the personality, sovereignty, and independence of States, and the faithful fulfillment of obligations derived from treaties and other sources of international law..."

Article 9 of the OAS Charter provides,

11

"States are juridically equal, enjoy equal rights and equal capacity to exercise these rights and have equal duties..."

The Charter of the Organization of African Unity (1963) states the first principle of the organization in language similar to that of the Charter of the United Nations  "Art. III The Member States, in pursuit of the purposes stated in Article II, solemnly affirm and declare their adherence to the following principles:  (1) the sovereign equality of all Member States."

The Convention on Rights and Duties of States, the "Montevideo Convention" which entered into force for the U.S. on December 26, 1934  provides in Article 4: "States are juridically equal, enjoy the same rights and have equal capacity in their exercise.   The rights of each one do not depend on the power which it possesses ... but upon the simple fact of its existence as a person under international law."   More than a decade before the U.N. Charter was drafted, the United States agreed that all states possess equal rights, equality in the exercise of these rights, equal juridical power and status and equality under the law and in the Courts of other states.

The Declaration of Principles of International Law concerning Friendly Relations and Cooperation Among States in Accordance with the Charter of the United Nations.  October 24, 1970. UNGA Res 2625 (XX_) 25 U.N. GAOR, Supp (No. 28) 121, U.N. Doc. A18028(1971);

"1. Solemnly proclaims the following principles...

"The principle of sovereign equality of States,

"All States enjoy sovereign equality.  They have equal rights and duties and are equal members of the international community, notwithstanding differences of an economic, social, political, or other nature.

"In particular, sovereign equality includes the following elements:
"(a) States are juridically equal;
"(b) Each State enjoys the rights inherent in full sovereignty;

12

"(c) Each State has the duty to respect the personality of other States."

The Supreme Court of Canada addressed the issue of sovereign equality and related principles in a  case  involving material seized in a search of the office of a Canadian citizen in the Turks and Caicos Islands.   The Supreme Court of Canada determined that the laws of the foreign sovereign controlled admissibility in Canadian courts of the evidence seized on principles of sovereign equality.  R. v. Hape, 2007 SCC 26;  [2007] S.C.J. No. 26;  2007 Can. Sup. Ct. LEXIS 27 (June 7, 2007).  The decision confirms and exemplifies the fundamental importance and vitality today of the principle of sovereign equality:

> (2) Principle of Respect for Sovereignty of Foreign States as a Part of Customary International Law and of Canadian Common Law
>
> 40. One of the key customary principles of international law, and one that is central to the legitimacy of claims to extraterritorial jurisdiction, is respect for the sovereignty of foreign states. That respect is dictated by the maxim, lying at the heart of the international legal structure, that all states are sovereign and equal. Article 2(1) of the Charter of the United Nations, Can. T.S. 1945 No. 7, recognizes as one of that organization's principles the "sovereign equality of all its Members". The importance and centrality of the principle of sovereign equality was reaffirmed by the General Assembly in the 1970 Declaration on Principles of International Law concerning Friendly Relations and Co-operation among States in accordance with the Charter of the United Nations, GA Res. 2625 (XXV), 24 October 1970, which expanded the scope of application of the principle to include non-U.N. member states. A renowned international law jurist, Antonio Cassese, writes that of the various principles recognized in the U.N. Charter and the 1970 Declaration:
>
> [T]his is unquestionably the only one on which there is unqualified agreement and which has the support of all groups of States, regardless of ideologies, political leanings, and circumstances. It is safe to conclude that sovereign equality constitutes the linchpin of the whole body of international legal standards, the fundamental premise on which all international relations rest.
>
> See A. Cassese, International Law (2nd ed. 2005), at p. 48.

The United States and the Syrian Arab Republic have both ratified the U.N. Charter and

13

been accepted as Members of the United Nations.  Both the U.S. and the Syrian Arab Republic

are bound by the Charter of the United Nations, the most universally accepted and important

treaty among nations, which embodies humanity's best chance for peace.  Both the United States

and the Syrian Arab Republic have committed themselves to faithfully observe the principle of

the sovereign equality of all U.N. Members, the foundation on which the United Nations stands,

which is essential to the fulfillment of all its purposes.

The unilateral, arbitrary and discriminatory act of the United States seeking to strip the

Syrian Arab Republic of its equal sovereignty by denying it immunity from claims brought

against it in Courts of the United States, based on an arbitrary, unilateral, discriminatory and

secret executive proclamation of the U.S. Secretary of State on unknown evidence, if any, which

singles out the Syrian Arab Republic with only several other sovereign U.N. Members violates

the duties of the United States to honor the sovereign equality of all U.N. Members under the

United Nations Charter, a treaty that is a part of the "supreme Law of the Land".  Article VI,

second paragraph, Constitution of the United States.

Any suggestion that FSIA §§1605(a)(7) does not violate equal sovereignty because the

Congress itself in §1605(a) stripped  the sovereign immunity of all foreign states equally, " (a) A

foreign state shall not be immune from the jurisdiction of courts of the United States or of the

States in any case" --then empowers the Courts to hear claims for the proscribed acts, but only if

the foreign state was designated by the Secretary of State  a state sponsor of terrorism, since the

Secretary of State could so designate all foreign sovereigns denies the obvious truth.  The

Secretary of State has not designated all foreign sovereigns and never will Instead she has

become the Grand Jury for the political indictment of political enemies.  Cf. Wyatt v. Syrian

14

<u>Arab Republic</u>, Judgment issued without opinion, 266 Fed Appx 1, 2 (D.C. Cir 2008)("But even if Article 2(1) [of the U.N. Charter] does demand strict equality across states, the provisions are not in conflict because § 1605(a)(7) does not treat Syria (and the other terrorism sponsor states) unequally. Any country can come within § 1605(a)(7)'s exception so long as the Secretary of State designates it a terrorism sponsor.")

All nations could not be so designated rationally.   The designation process would have no meaning if all foreign sovereigns were to be designated, except to offend every nation.   Yet until all are designated, those designated are denied equal sovereignty.  If the Congress wanted to make all acts of terrorism by foreign states against U.S. nationals actionable in the U.S. courts it would not have added the direction that the court "shall decline to hear a claim ... if the foreign state was not designated ... at the time the act occurred."

Justice Scalia writing for a unanimous Court made the discrimination clear: "In brief, 1605(a)(7) stripped immunity from a foreign state for claims arising from particular acts, if those acts were taken at a time when the state was designated as a sponsor of terrorism." <u>Republic of Iraq</u> v. <u>Beaty</u> , No. 1090, decided June 8, 2009, Slip opinion at p. 2.   Fewer than 10 States have been designated at any time.

The issue must be of special concern to the judiciary, because it has been made the principal instrument for governmental actions that violate the First Principle of the United Nations.   The federal courts will lose a part of their judicial independence, be complicit in a process in violation of international law and the Constitution, be seen among nations as a political instrument of U.S. policy and suffer legislative and executive recession of their judicial acts including final judgments if they fail to address the Syrian Arab Republic's right to equal

15

sovereignty including juridical equality.

The U.N. Charter means only to insure the equality of sovereignty for all its Members so that all will be treated equally as to their sovereignty and cannot take offense that the U.N. itself, or one, or more of its Members are discriminating against it by denying it equal sovereignty.

The violation of the Syrian Arab Republic's sovereign equality by the United States acting through its Courts under an Act of Congress which authorizes the Secretary of State to designate politically selected states as sponsors of terrorism and thereby confer jurisdiction over the selected few, in this case the Syrian Arab Republic, is undeniable. Of the 192 Members of the United Nations only a handful have ever been considered, or designated state sponsors of terrorism by the Secretary of State of the United States.

Who will believe the U.S. may designate as a sponsor of terrorism an ally, trading partners, or a nation in which we have significant economic interests. It never has. Who will believe other countries, including the U.S. itself, have not sponsored the very acts defined as terrorist by third parties or foreign countries? Many have. The Syrian Arab Republic by force of the U.S. Secretary's designation is deprived of its fundamental right of equal sovereignty, which includes immunity from coercion by the courts of a foreign nation for governmental acts alleged, as here, to have occurred outside the United States.

The Syrian Arab Republic is threatened by this lawsuit with the deprivation of an essential element of its equal sovereignty, its subjugation to the power of U.S. Courts for sovereign acts alleged to have been committed in its own and neighboring territory, while virtually all other Members of the United Nations retain their sovereign immunity.

The Congress has proclaimed for the Courts of the United States, this extraordinary

16

worldwide extraterritorial jurisdiction over sovereigns the U.S. arbitrarily selects to subject to the coercive power of its Courts in violation of their rights to sovereign equality.

If FSIA §1605(a)(7) were applied equally to all U.N. Members by simply providing that no nation shall have sovereign immunity in U.S. courts for the specified terrorist acts, Art. 2.1 of the U.N. Charter would not be violated though sovereign immunity among nations would be radically altered and chaos might ensue for U.S. foreign policy and federal court dockets.

Few acts of state impinge more directly on the sovereignty of another state than seeking selectively to subject a sovereign to physical coercion in a foreign Court to adjudicate its conduct, compel testimony from its officials, even a head of State, or government, the production of confidential government documents,  impose judgment on its acts, exact damages and inflict penalties.

That denial of sovereign immunity by §1605 impacts on matters of State is acknowledged by §1605(g) which provides that the U.S. Attorney General can obtain a stay of any request, or order for discovery demanded from the United States by certifying it would interfere with a criminal investigation, or case, or a national security operation, create a serious threat of death, or bodily injury, or adversely affect the ability of the U.S. to work with other sovereigns, or international law enforcement agencies in investigating violations of U.S. law.  Yet the same intrusions are threatened on the sovereignty of a foreign state under §1605 without its ability to certify the intrusion would interfere with its government operations.  We have seen the U.S. executive time and again refuse to release U.S. state secrets to its own courts, yet it now demands that foreign sovereigns do so.

This selective denial of sovereign and  juridical equality, is a grave breach of the U.N.

Charter, second only, perhaps, to war of aggression.   It is demeaning and an assault on the

independence, dignity and honor of a sovereign and intrudes on its sovereign conduct to be

subjected to foreign judicial power and judgments over its acts of state selectively, where favored

states are protected from such intrusion.  It is a form of war by other means because it seeks to

coerce an equal sovereign, order its executives, compel their testimony, force disclosure of state

secrets, seize its property, interfere in its financial transactions, impose draconian penalties,

freeze its bank accounts, funds owed by and to it and place liens on its properties in amounts

asserted by private citizens of the U.S. on the mere filing of a lawsuit.  See §1605A(g).   Where it

singles out nations on an arbitrary, secret, unchallengeable basis determined by the highest

foreign policy officials of the U.S., it will destroy friendly relations, cooperation and harmony

between nations and brand U.S. Courts as political instruments of U.S. foreign policy.

Sovereign immunity is an essential attribute of sovereignty.  The recognition of sovereign

immunity among nations, as distinguished from sovereign immunity of a government from suits

in its own courts by its own people, or others, does not mean or imply that the King can do no

wrong.  Among states it means we recognize and respect your equal sovereignty and that we

have no right to selectively intrude on it.

As best defendants have been able to determine, the FSIA provisions which authorize the

selective denial of sovereign immunity to a few nations are unique.  We have found no other

system of sovereign immunity by convention,  treaty,  statute, practice or otherwise  that allows

the denial of sovereign immunity for acts of state on the basis of such political selectivity.  Not

surprisingly these provisions are exercised by the U.S. against disfavored nations, adding injury

to the insult of calling them terrorist states, and making them more hostile in the process.  There

is a federal regulation which defines "friendly foreign government" to mean "Any government

with whom the United States has diplomatic relations and whom the United States has not

identified as a State sponsor of terrorism." 27 CFR 478.11 Meaning of Terms.    Our fixation on

four acts of terrorism has rendered those acts for more offensive to friendship with foreign

governments than wars or aggression , genocide and crimes against humanity.

International law has alwas and necessarily been based on the equality of sovereigns.

Chief Justice John Marshall spoke eloquently of the principle in the seminal case of the French

Schooner Exchange, which had taken refuge in the port of Philadelphia.   Marshall explained the

supremacy of each sovereign over its own soil and the waiver by every sovereign of a part of its

exclusive territorial jurisdiction, as follows:

> "Th[e] perfect equality and absolute independence of sovereigns, and th[e] common
> interest impelling them to mutual intercourse, and an interchange of good offices with
> each other, have given rise to a class of cases in which every sovereign is understood to
> wave the exercise of a part of that complete exclusive territorial jurisdiction, which has
> been stated to be the attribute of every nation." Schooner Exchange, v. M'Fadden, 7
> Cranch, at 137, 11 U.S. 116, 3 L.Ed. 286 (1812)

No other Member of the U.N. has claimed worldwide extraterritorial jurisdiction for its

courts over sovereigns it selects.

Congress recognizes the principle of Equal Sovereignty in the FSIA, as it has historically,

in creating jurisdiction of U.S. courts over foreign sovereigns.   The sovereign equality of all

foreign states are not violated by the denial of immunity and consequent exercise of jurisdiction

by U.S. courts for activities defined in FSIA §1605(a) 1-6, or 1605(b)-(d) which address mainly

commercial activities, because they apply equally to all sovereigns and international law does not

recognize sovereign immunity under the circumstances described therein.   See FSIA §1605,

Findings and Declaration of Purpose. ("Under international law, states are not immune from the

jurisdiction of foreign courts insofar as their commercial activities are concerned..." stating other recognized exceptions.)

Except for §1605(a)(7), which singles out U.S. designated "sponsors of terrorism," the Foreign Sovereign Immunities Act treats foreign sovereigns equally,  recognizing their sovereign and juridical equality as required by the U.N. Charter. §1605(a) provides that a "foreign state shall not be immune from the jurisdiction of Courts of the United States or of the States" in any case specified in the section. §1605(a) (1)-(6) dealing generally with cases of waiver of immunity; commercial activity in the United States; property in the United States; personal injury, or death in the United States caused by tortious acts of a foreign state; in effect, codifying the restrictive recognition of sovereign immunity. §1605(b)-(d) deny immunity in admiralty, maritime liens and ship Mortgage cases where nations share jurisdiction.  In all these provisions, FSIA §1605(a)(1)-(6) and §1605(b)-(d), all foreign sovereigns are treated equally.

§1605(a)(7) initially refers equally to all foreign sovereigns denying all nations immunity "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ...for such an act" if engaged in by an official, employee, or agent of a foreign state acting within the scope of his or her authority.  It then violates the principle of sovereign equality by providing  "...except that the court shall decline to hear a claim under this paragraph – (A) if the foreign state was not designated as a state sponsor of terrorism", further providing "unless later so designated as a result of such act or the act is related to Case Number 1:00 CV 03110(EGS)" in the District Court for the District of Columbia.  The entire legislative scheme is an offensive acceptance of terrorist acts of friends while violating the spirit of equal protection and equal justice, equality

being the mother of justice.  The last provision is a dubious and unfortunate intrusion by

Congress into a case under adjudication in a U.S. Court, a recurrent and harmful problem under

§1605(a)(7), destructive of Article III powers and duties as is presented below.

　　　Two states, Iraq and Libya, long designated sponsors of terrorism, have been removed

from the select list of sponsors of terrorism and judgments entered after years of judicial

proceedings against them have been nullified, thus violating the finality of judgments of U.S.

Courts, threatening the independence of Article III courts and U.S. adherence to the rule of law.

Other States are being considered for removal an event that is inherent in the fluid politics of

international relations.

　　　And despite its far reaching international power, must expect that in time, nations will

retaliate against the U.S. through their courts to  expose the U.S. not only to liability for its direct

acts of violence but for acts of the many other states that receive military aid and technical

assistance from the U.S.    Such offenses are equally grievous whoever their perpetrator.

**B.**　　**Congress Did Not Intend to Violate the First Principle of the U.N. Charter – The Sovereign Equality of Nations -- by Enacting the FSIA Provisions**

　　　Only a law enacted by the Congress that clearly states the intention of Congress to violate

the law of nations, or revoke or modify a provision of a treaty entered into by the United States,

can alter or rescind international law, or  a treaty entered into by the United States or any of its

provisions, as part of the laws of the United States.

　　　"It has been a maxim of statutory construction since the decision in Murray v. The

Charming Betsy, 2 Cranch 64, 118 (1804), that 'an act of Congress ought never to be construed

to violate the law of nations, if any other possible construction remains...'" .  Weinberger,

Secretary of Defense, v. Rossi, 456 U.S. 25, 32 (1982).  See also, United States v. Palestine

21

<u>Liberation Organization</u>, 695 F.Supp. 1456, 1465 (S.D.N.Y. 1988).

The Congress was aware that issues of sovereign immunity are directly and importantly related to friendly, cooperative and harmonious foreign relations and are defined in customary international law and dealt with in many treaties and agreements, including the Charter of the United Nations.  Congress therefore provided in the Foreign Sovereign Immunities Act of 1976, that its provisions were "Subject to existing international agreements to which the United States is a party at the time of enactment of this Act..."  28 U.S.C. §1604.  This provision subjects the FSIA to the provisions of the U.N. Charter, above all international agreements, and prohibits the violation of equal sovereignty and juridical equality.

Thus, the FSIA affirmatively recognizes that the provisions of the U.N. Charter are controlling, when the FSIA is inconsistent with them.  §1604 demonstrates that Congress was aware that international agreements might be in conflict with provisions of the FSIA and that it did not intend to revoke any international agreements in part, or whole, but subjected the FSIA to all existing international agreements

Further, in the proceedings leading to the enactment of Section 1605(a)(7) Congress did not reveal any consideration of U.S. obligations under the Charter of the United Nations, or its first principle set forth in Chapter I, Article 2, paragraph 1, much less an intention to renounce those obligations.  By FSIA §1604, Congress states its intention to abide by the provisions of the U.N. Charter.  The FSIA cannot therefore be construed to revoke the treaty obligations of the United States in the Charter of the United Nations to respect the sovereign equality of all U.N. Members.

Nothing in the words of the FSIA, its §1605(a)(7), or the legislative history of their

22

enactment implies that Congress intended to violate the first principle of the Charter of the United Nations to respect  "...the sovereign equality of all its Members."  It is unlikely that the Congress of the United States would ever do so.

In the legislative history and the Act that gave rise to U.S. v. PLO, Congress made explicit its intention to close the Permanent Observer Mission of the PLO to the United Nations, as well as bar the PLO from any presence in the U.S.  The Congress made no reference, however, to the United Nations Headquarters Agreement, a treaty between the U.N. and the U.S.

The legislation and case arose at an extremely emotional and heated time in the Middle East and high U.S. hostility toward the PLO.

The District Court reviewed the Headquarters Agreement, determined that Congress had violated its protection of U.N. invitees to the U.N. Headquarters in New York and  found further that Congress had not manifested an intent to violate the Headquarters Agreement.  On the authority of the Charming Betsy and Weinberger, Secretary of Defense cases cited above, the Court therefore dismissed the complaint of the United States seeking closure and removal of the Mission from the U.S.

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts". Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  If Congress chooses to authorize claims against foreign sovereigns in U.S. Courts, in violation of the Charter of the United Nations for acts described in §1605(a)(7), it will have to affirmatively state its intention to do so.  This it has not done.

The Charter of the United Nations requires that its Members settle disputes and resolve problems between and among them not by unilateral action, but peacefully without resort to

force,  the threat of force, or coercion.   Members must resolve disputes  by diplomacy,

negotiations, mediation, conciliation, arbitration, other agreements, within regional organizations

or through the services of the Security Council, the General Assembly, the Secretariat of the U.N.

or the International Court of Justice.  See, e.g. Article 2.3, Chapter VI of the Charter and the

Statute of the International Court of Justice.

For a Member of the U.N. to attempt to directly subject another Member to the

jurisdiction and power of its domestic courts for acts that are clearly and conceded to be acts of

state in violation of the U.N. Charter and international law and to compel compliance with the

commands to its highest officials to testify under oath, to surrender documents and divulge state

security, to pay sums awarded by a foreign court including punitive damages, as here, for the acts

of foreigners not under its control, is a use of judicial force against that member, a serious

provocation and a clear violation of the Sovereign Equality of Nations.

**C.**      **Designations under Section 1605(a)(7) by Violating the Equal Sovereignty of U.N.**
        **Members Designated State Sponsors of Terrorism Have Seriously Impaired Efforts**
        **to End of the Scourge of War, Harmed the Peoples of the United Nations, Damaged**
        **the United States in the Conduct of Its Foreign Relations and Assaulted the Foreign**
        **States it has Unilaterally Labeled Terrorist and Attempted to Selectively Hold**
        **Subject to the Jurisdiction of U.S. Courts**

§1605(a)(7) of the Foreign Sovereign Immunities Act of 1976, an amendment to the Act

in 1996, seeks to confer unprecedented extraterritorial jurisdiction on the Courts of the United

States over foreign sovereigns acting in their own territory or in other lands outside the U.S..

Here, the Court is asked to adjudicate alleged activity of the government of the Syrian Arab

Republic in Syria and in Iraq where the U.S. government has a huge military force and thousands

of civilian government employees and contractors.

The Syrian Arab Republic is a foreign sovereign state.  By designating it under

24

§1605(a)(7) the U.S. seeks to deny the Syrian Arab Republic, already labeled an evil empire by the U.S.,  its sovereign equality and subject it to the power of the U.S. courts based on arbitrary, secret, unchallengeable and discriminatory findings of the U.S. Secretary of State acting for the U.S. in her official capacity pursuant to this Act of Congress.  The vast majority of U.N. Members are not equally threatened by the U.S. with such an assault on their sovereignty.

No other nation seeks to exercise such far reaching, arbitrary and imperial jurisdiction over other U.N. Members through its courts in violation of the Charter of the United Nations and customary international law.  If other nations sought to exercise such extraterritorial jurisdiction through their courts, forcing testimony from heads of state, demanding files of military and intelligence organizations, deciding questions of fact from events on foreign soil, and the secret conduct of foreign agents beyond the reach of their courts to know, proclaiming draconian penalties against foreign sovereigns and seeking execution on sovereign properties worldwide, chaos would result.    §1605(a)(7) is ill designed, even if it were permissible under international law, as a means to fairly and equally compensate victims of violent government crime by foreign sovereigns.  " ... the law was intended as a sanction, to punish and deter undesirable conduct.". Republic of Iraq v. Beaty Supreme Court of the United States, No. 07-1090, decided June 8, 2009, slip op. p. 10   The plaintiffs, are a minuscule number among thousands of victims.  The sums sought are staggering by any measure.

The identical criminal conduct alleged here, or the same or similar "terrorist"acts, a hundredfold more deadly, if committed by any of the more than 190 Members of the U.N., or their officials,  including the U.S., which are not designated a state sponsor of terrorism can not be pursued in U.S. courts.  Nor can nationals of a state designated a sponsor of terrorism by the

U.S. sue the U.S., or any other nation that may have inflicted equal, or greater injuries or death on them because of sovereign immunity, compounding the denial of equal justice under law, unless their nations enact and are able to enforce through their courts legislation stripping other nations they choose of sovereign immunity.

Cases brought under FSIA §§ 1605(a)(7) make the U.S. Courts and U.S. law an aggressor enforcing the present political agenda of the Executive Branch of the U.S. acting on a discriminatory basis seeking exorbitant rewards for U.S. citizens alone and punishing the selected foreign sovereigns with punitive damages.   And when the political winds change, as they do constantly, the Executive branch has and will again file Statements of Interest and take other actions aborting the labors of the judiciary for political reasons, rendering the federal courts powerless, their judgments cruel jokes.

Opposition to the legislation was forcefully stated by the U.S. Department of State in hearings preceding enactment of §1605(a)(7).   See, e.g. Testimony of Jamison S. Borek, Deputy Legal Advisor, Department of State, before the Senate Committee on the Judiciary, Sub-Committee on the Courts and Administrative Practice, considering Foreign Terrorism and U.S. Courts, June 21, 1994, against enactment of S.825 concerning state-sponsored terrorism.   See also the recommendations for compensation for victims of terrorism in the Testimony of William H. Taft, IV, Legal Advisor, U.S. Department of State, Committee Hearing, Senate Foreign Relations Committee,  Hearings on Benefits for Victims of Terrorist Attacks, July 17, 2003.

**D.**      **The Power of the U.S. Secretary of State under FSIA §1605(a)(7) to Designate a Foreign State a Sponsor of Terrorism and the Procedures Followed are Lawless, Antithetical to the Rule of Law and Endanger the Independence of the Federal Judiciary.**

There are no criteria or procedural requirements for or renewal of the Secretary of State's

imposition,  continuance, or withdrawal of the designation of a state as a "sponsor" of terrorism. Federal courts processing cases brought under FSIA §1605(a)(7) cannot inquired into the basis for the Secretary' designation and can be left in limbo at any moment in the proceeding, their judgment aborted after years of litigation and toil by the decision of the executive branch.

Both of the statutes cited in §1605(a)(7) (A) as the source of the designation "state sponsor of terrorism," the Export Administration Act of 1979 and the Foreign Assistance Act of 196,1 provide for a determination by the Secretary in the same language, that "the government of such country" has "repeatedly provided support for acts of international terrorism."  Neither statute speaks of sponsorship or empowers the Secretary of State to designate the UN Member as a sponsor of terrorism.  The determination contemplated by these two statutes and authorized for different purposes  is different from a designation as a state sponsor of terrorism.  While it may seem roughly equivalent, there are important differences.  That §1605(a)(7) equates the determination in these two statutes with a designation that a state is a sponsor of terrorism illustrates the arbitrary nature of the Secretary's actions under §1605(a)(7).

§1605(a)(7) contains no definition of "terrorism" or "sponsor of terrorism"  for the Secretary to employ in making a designation under the section , despite other definitions provided in §1605(e),.  No notice is given to the foreign state.  There is no hearing or record required.  No formal decision or informal explanation whatsoever is required of the Secretary.  There is no provision for administrative or judicial review of the designation's imposition or continuance.  No attempt, even a feeble one, at due process or fundamental fairness is required by the statute.   No identification or findings are required with respect to the nature and extent of the state's purported terrorism .    And on this basis, a foreign nation is deprived of its equal sovereignty before U.S.

courts in violation of the first principle of the United Nations.

The procedural and other requirements imposed by 8 U.S.C. §1189, which authorizes the Secretary of State to designate an organization as a "foreign terrorist organization," meager as they are, stand in sharp contrast to the completely undefined, unfettered, unstructured, unreviewable power §1605(a)(7) confers on the Secretary to designate foreign states as sponsors of terrorism.

Designation under §1605(a)(7) has been overtly political and predictable.  Few states are selected and all states selected are consistently treated in various ways by the executive and legislative branches as enemies of the United States, even evil empires.  The designation as a sponsor of terrorism is obviously one that has never been imposed on an ally, a client state, or friendly nation, no matter how open and notorious its terrorist conduct has been.  Removal of the designation of state sponsorship of terrorism has been equally political and protective of U.S. political and economic interests while demeaning the independence and commitment to the rule of law of Article III power,  the dignity of U.S. Courts and U.S. devotion to the rule of law.

The determination that a state is a "sponsor" of terrorism under §1605(a)(7) apart from denying the state equal sovereignty and depriving  it of sovereign immunity has no function or meaningful significance in the operation or application of the statute other than selecting the states to be deprived of their sovereignty.  There is no requirement that there be any causal, or other relationship  between any factual basis for the designation of a state as a sponsor of terrorism and the terrorism alleged in a law suit.  Nor is it required .that findings of the Secretary include acts similar to those defined in §1605(a)(7) or §1605A.

While a sufficient causal link or nexus must be shown between the conduct of a defendant

state that is defined in §1605(a)(7) in  order to establish jurisdiction and  to establish  liability  –
that one of the four proscribed acts of  terrorism or support for the act has occurred – the
Secretary is free of any such requirement in making her designation.

The absence of any requirement that there must be a connection between the basis for a
designation by the Secretary and any action based on the designation filed against such a state in a
U.S. court is added confirmation of Congress' intention that a designation under§§1605(a)(7)  be
used solely for political ends against disfavored or enemy states,  not against friendly nations and
not for the purpose of deterring terrorist violence generally, but to demean nations that defy U.S.
authority.


**II.     The Syrian Arab Republic has Responded in this Case as a Courtesy to the United
States Hoping that by Reasoning Together in U.S. Courts this Harmful and Unlawful
Practice can be Ended and a Step Toward Better Relations Taken**.

The Syrian Arab Republic has responded to this lawsuit brought against it in U.S. Courts
by private parties under §1605(a)(7) solely to contest U.S. claims to jurisdiction over it in
violation of its sovereign equality as a matter of courtesy to the United States.  Failure to appear
can result in default judgments that strain relations and create friction and difficulties between
nations that may take years to resolve.  Such tensions can lead to conflict.  It is better to consider
and resolve any jurisdictional questions at the threshold and avoid protracted conflict and tension
between the United States and U.N. Members the U.S. Secretary of State designates State
Sponsors of Terrorism..   It is hoped that by reasoning together it can be agreed that the statute
under which this case is brought violates the Charter of the United Nations and customary
international law.

It is helpful to consider that other nations will have different opinions about which nations are sponsors of terrorism.  The United States has military personnel posted around the world and is engaged in armed conflict in several countries.  It provides vast military aid, police training, observers, personnel, intelligence and motivation to the use of force to scores of nations frequently accused of terrorist acts and human rights violations, including in the Middle East area alone, Egypt, Israel, Pakistan, Saudi Arabia, and both the former and present governments of Iraq and Afghanistan.  If the U.S. perseveres in its failing effort to select sponsors of terrorism other nations whose citizens are victims of violence by such nations may in time  decide to authorize suits against the U.S. for committing and sponsoring  terrorism, holding the U.S. responsible for resulting deaths and injuries though most will realize that for now their power to intercept or disrupt  international banking activities, economic transactions, and property transfers or seize U.S. assets is comparatively feeble.

For any nation to unilaterally assume authority to deprive another nation of its equal sovereignty by selectively authorizing suit against it for acts occurring on its own soil, or in its part of the world and seek to assert its judicial power over that nation where international law prohibits such use of judicial power, threatens the breakdown of international law and the ability of the United Nations to pursue its many important purposes.  Such designations of state sponsors of terrorism are arbitrary, inherently political, made unilaterally and secretly against selected "enemies" – the evil empires –  as sanctions, or punishment to coerce conduct  and create international hostility and tensions against the United States,  inviting retaliation, crippling the capacity of the United Nations and international law to end the scourge of war.

### III.     This Case Presents Non-Justiciable Political Questions

This case is not an ordinary tort case constitutionally vested in the jurisdiction of U.S.

Courts.  The events occurred on the far side of the planet where writs from U.S. Courts have no

power to coerce conduct, compel compliance with discovery and other orders essential to the

judicial function and where they intrude on the authority of foreign sovereigns and the laws,

customs and living standards of the people.  The attempt to exercise U.S. judicial power over

Syria, its ministries, officials and Treasury for governmental acts of state, wears the mantle of

imperialism , not the rule of law.  It denies Syria sovereign equality and threatens economic

warfare through the U.S. courts on the Syrian people measured by U.S. standards for liability,

economic damages determined in a far richer country than theirs by its materialistic values.

Adding insult to injury, it claims authority to compel testimony from the head and high officials

of government and compel production of the most sensitive secrets of state;. there is the claimed

authority to impose punitive damages on a sovereign state, to place a lien on the assets of  that

government in the amount of damages claimed , a billion dollars in this case, on the first day the

case is filed, all against the  material wellbeing of the Syrian people.

The near half a billion dollars in damages and penalties assessed against Syria for the

deaths of  two Americans murdered in Iraq by Al Qaeda in Iraq in Gates v. Syrian Arab Republic,

580 F.Supp. 2d 53 (DCD  2008)(RMC), among the thousands of American deaths that have

occurred in Iraq since the U.S. invasion in 2003 and the hundreds of thousands of Iraqi deaths can

only fill Syrians and most of the rest of the world with wonder at the unilateral monetary demands

U.S. laws place on American deaths and  America's non-accountability for the lives it takes.

With a gross domestic product per capita of $7,000, it would take 30,000 years for the average Syrian to earn the sum awarded for the death of one American in <u>Gates</u>.

That the enactment of FSIA §1605A makes the judiciary of the United States an even greater political instrument of U.S. foreign policy is clear.

To read the complaint in this case, or any case brought under these unprecedented amendments to the FSIA which selectively deprive a handful of foreign sovereigns of their immunity in U.S. courts in violation of the First Principle of the U.N. Charter for the four acts specified in the amendments, is to know that Congress is conferring power on the judiciary to use as an instrumentality of U.S. foreign policy to impose sanctions on a foreign state.  The judiciary is involved in the pursuit of temporal political goals amidst the vicissitudes of U.S. foreign policy to assist in accomplishing the fleeting foreign policy purposes of the political branches.

To read the complaint filed by plaintiffs is to see that the Court is asked to find facts on political issues of extreme sensitivity beyond its competence to obtain demonstrable facts and weigh reliable evidence and beyond even the ability of U..S. intelligence agencies and those of any other major nations which spends billions of dollars on highly sophisticated and intrusive methods and efforts, including highly trained spies and informers to gather information about activities of foreign governments.  As an example of the difficulty of obtaining such evidence, is Israeli Sgt. Zachary Baumel, listed as missing in action by Israel at all times since the battle at Sultan Yaqub, Lebanon on June 11, 1982, in Syrian custody?  See <u>Baumel</u> v. <u>Syrian Arab Republic</u>, 06cv682 (DCD)(RMC).   Despite years of effort Israel admits to having no evidence that Sgt. Baumel survived the battle at Sultan Yaqub, is alive, or is in Syrian custody.  Can plaintiffs hope to discover verifiable evidence concerning an Israeli soldier missing in action that

has eluded Israeli intelligence for 27 years?  Can a U.S. Court credibly evaluate such evidence?

The complaint in this case raises as issues for the Court, among many other highly

political and controversial questions to be resolved:

> – whether "Syria provided material support and resources for ... the terrorist bombing and terrorist shooting and harm to the plaintiffs herein" Complaint ¶ 18,

> – whether "Defendant The Syrian Military Intelligence .. Within the scope of its agency and office ... provided material support and resources for ... extrajudicial killing including the terrorist bombing and terrorist shooting and "other actions that caused ... harm to plaintiffs ..."  Complaint ¶ 21,

> – whether  "The Syrian Air Force Intelligence Directorate ... provided material support and resources for ... extrajudicial killing including the terrorist bombing and terrorist shooting and other actions that caused ... harm to plaintiffs ..."  Complaint ¶ 25,

> – whether "Since its establishment in the 1960's and until the present day, the Palestine Liberation Organization ("PLO") has planned and carried out thousands of terrorist bombings and shootings,, resulting in the deaths of hundreds of innocent civilians and the wounding of thousands more.  Dozens of U.S. citizens have been murdered and scores more wounded by terrorist attacks carried out by the  PLO" Complaint ¶ 28,

> – whether The PLO has rarely, if ever, carried out terrorist attacks in its own name.  Rather ... the PLO has funded, planned and carried out terrorist attacks through its officials, agents and employees, who are organized into various factions, units, cells and groups which plan and execute current attacks ... for the PLO, and/or as agents and/or and /or as organs ... and/or as alter egos of the PLO ..." Complaint ¶ 29,

> – whether The Syrian defendants provided the material support and resources ... to the PFLP (Popular Front for the Liberation of Palestine) faction of the PLO pursuant to an agreement reached between Syria and the PFLP ...in 1968, which remains in force until today.  Under that agreement, the PFLP ... undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Syria undertook to provide the

33

PFLP material support and resources to carry out such extrajudicial killings and terrorist attacks."  Complaint ¶ 33,

– whether The material support and resources which were provided by the Sytian defendants to the PFLP in the years immediately prior to the terrorist bombing ... and shooting ... included <u>inter</u> <u>alia</u> provision of massive financial support to the PFLP ... totalling many millions of dollars for the purpose of carrying out terrorist attacks; provision of military grade explosives, military firearms ... specialized and professional military training ... electronic communication equipment ... financial services ... to ... carry out further terrorist attacks.  Complaint ¶ 34,

– Whether Defendants brazenly ignored the finding and determination by Congress that the PLO was responsible for 'the murders of dozens of American citizens abroad' ... and continued to conspire with and systematically provide massive material support ... to the PLO .. With the specific intention of causing ... extrajudicial killing ... with actual knowledge that the PLO ... were planning to carry out terrorist attacks against U.S. citizens and cause the extrajudicial killing of U.S. citizens ..." Complaint ¶ 48.

Each of these issues among many others found in the complaint raises questions of fact of importance to the U.S. in determining its political position and foreign policy toward Syria, the PLO, Israel, Lebanon and the general question of the political relationship our government should seek with countries where such questions exist.  If the Courts provide their answers usually on uncontested evidence they intrude on the foreign relations policy powers of the political branches on questions they have slight capacity, if any, to decide.   Every U.S. President, Secretary of State and other high foreign policy officials since 1977, at least,  has spent enormous amounts of time in office dealing specifically with political questions involved in finding peace in the Middle East. We have provided Israel with billions of dollars of military and economic aid and Palestine with substantial economic aid in the quest for peace.  U.S. knowledge of many of the highly sensitive political questions raid by the complaint in this case is imperfect, its intelligence activity is

ongoing and secretive.

These very political questions are "inextricably intertwined" with ongoing foreign policy and political decisions to be made by the political branches of the U.S. government and are beyond the competence of the judiciary to answer.

Political questions reserved to the political branches necessarily include not only political decisions that have been made and actions  the political branches have taken in the past, but all political questions inextricably intertwined, past, present and future with Congressional and Executive considerations of foreign policy decisions to be taken in determining the foreign policy of the United States.   The Constitution is as concerned with protecting future foreign policy decisions of the political branches from judicial intervention as it is in protecting past foreign policy decisions from judicial review.    See, e.g. Bancoult v. McNamara, 445 F.3d 427, 433 (D.C. Cir 2006);  Hasbury v. Hayden, 522 F.3d 413 (D.C. Cir. 2008); El-Shifa Pharmaceutical Industris v. U.S., 559 F.3d 578 (D.C. Cir 2-1, decided  March 27, 2009; Petition for Rehearing and Rehearing En Banc pending, U.S. opposition filed at Court's request, June 18, 2009.

Articles I and II of the Constitution of the United States delegate all the powers possessed by our federal government to conduct foreign policy to the Congress and the Executive.  These are the political branches of government empowered to decide political questions and conduct the political affairs of our nation limited only by powers vested in the Judicial Branch or reserved to the States and the people and by rights protected within the Constitution, the Bill of Rights and subsequent Amendments.

The Judicial Power is vested in the Supreme Court and such lesser courts as Congress has and may yet establish.  The integrity of the rule of law, the fundamental principle of every nation

of laws, depends utterly on the independence of the judiciary from external politics and interest, its consistent refusal to address political questions and its strict adherence to legal principles.

For the Judiciary to become involved in political questions is to erode the rule of law, make Courts mere instruments for advancing political policies and deprives the people of the blessings of a government of laws in which fundamental principles prevail over political expediency.

The Supreme Court has made clear that the Constitution confers all power over foreign affairs to the Congress and the Executive, the political branches.  It has also expressed specific concern that courts abstain from involvement in the politics of foreign relations: "Matters intimately related to foreign policy and national security are rarely proper subject for judicial intervention."  Haig v. Agee, 453 U.S. 280, 292 (1981).

FSIA §§1605(a)(7) and 1605A are more than intimately intertwined with foreign policy, they implement it.   The U.S. Court of Appeals for the District of Columbia Circuit has repeatedly held in recent years that foreign relations are "quintessential sources of political questions." Bancoult v. McNamara, 445 F.3d 427, 433 (D.C. Cir 2006), see, e.g. Hasbury v. Hayden, 522 F.3d 413 (D.C. Cir. 2008); Gonzalez–Vera v. Kissinger, 449 F.3d 1260 (D.C. Cir. 2006); Schneider v. Kissinger, 412 F. 3d 190 (D.C. Cir. 2005).

The political motives behind the enactment of the original Anti-Terrorism Act of 1990, reenacted without substantive change in 1991, were approved by voice vote in both Houses of Congress without a dissent recorded as a floor amendment to an unrelated bill in acknowledged reaction to the murder of Leon Klinghoffer.  The amendments created a civil cause of action for international terrorism against individuals and organizations and were concerned directly with the

Palestine Liberation Organization, but not foreign states, 18 U.S.C. §§2331, et seq..

The amendments to the FSIA adding the state sponsor of terrorism provisions in April 1996, codified at FSIA §1605(a)(7),  and amendments enacted on  January 28, 2008, codifying §1605A  authorizing the selective stripping of sovereign immunity by designation of the Secretary of State to then be processed  in U.S. Courts against a few selected U.N. Members,  reveal an intense political desire to pursue and harm the designated U.N. Members, political enemies of the moment, evil empires, no less.

The Supreme Court confirmed the punitive purpose of the Congress in Republic of Iraq v. Beaty , No. 07-1090, decided June 8, 2009, finding  "...the fact that §1605(a)(7) targeted only foreign states designated as sponsors of terrorism suggests that the law was intended as a sanction to punish and deter undesirable conduct" Republic of Iraq, v. Beaty, op cit. Slip op. at p. 10.

 No one who reads the daily newspapers, watches the evening international news on TV or hears it on the radio could doubt that there are many countries which have committed one, or more of the four acts prescribed in the FSIA §§1605(a)(7) or 1605A or furnished material support for those acts, including our own.  But only a select few are denied their sovereign immunity in U.S. courts.

Consideration of the tests for non-justiciability set forth in Baker v. Carr demonstrates that political questions are raised in this case.

> ...Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of

government; or [5] an unusual need for unquestioning adherence to
a political decision already made; or [6] the potentiality of
embarrassment from multifarious pronouncements by various
departments on one question.  369 U.S. 186, 217 (1962).

The tests in <u>Baker</u> v. <u>Carr</u> have been applied to and served longer in more fields of human

activity and judicial review  without significant judicial criticism, or adaptation, than any other

Supreme Court decision that comes to mind.  Yet the political questions that might arise in cases

involving the judicial reapportionment of legislative electoral districts in the U.S. seem quite

remote from the political questions that may occur in determining U.S. foreign policy questions

arising from varied acts of violence in Palestine, Israel , Iraq and elsewhere around the world.

And the <u>Baker</u> tests, for all the wisdom they reveal, serve awkwardly in determining whether

political questions infect the exercise of  jurisdiction over a politically selected sovereign, Syria,

for alleged sponsorship of acts of terrorism by third parties  in a neighboring foreign jurisdiction,

the Israeli occupied West Bank of Palestine.

Even so, FSIA §§1605(a)(7) and 1605A as applied in this case fails all six <u>Baker</u> tests.

(1) The Constitution clearly commits issues of foreign relations and policy to the

Executive and Legislative branches.  For the Judiciary to be empowered to litigate issues against a

foreign sovereign concerning its acts of state and necessarily make highly political and

inflammatory findings of fact concerning secret policies and acts of a foreign sovereign on foreign

soil immerses U.S. courts in distant, indeterminable and dangerous foreign political activities.

To deprive that sovereign of an interlocutory appeal of an adverse decision that the Court has

personal and subject matter jurisdiction, make findings of fact about its confidential State  policies

and official acts affecting the U.S. and U.S. citizens, assess damages and authorize freezing of

assets in the amount of damages alleged in a complaint upon its filing all amidst the highly

charged  political emotions of a case against foreign enemies with foreign cultures and economic

standards of  living, seeking to coerce their highest officials, ministries and personnel to reveal

facts, including state secrets of a nature the U.S. executive would refuse to reveal in U.S. courts

and pay punitive damages, reveals a  political motive, however temporary, to punish that

sovereign through U.S. courts and  is an impermissible judicial intrusion into the conduct of

foreign affairs addressing political questions not permissible for judicial consideration by the

Constitution and subjecting judicial proceedings and judgments to revocation by Congress, or the

President.

(2) The Judiciary lacks discernable and manageable standards and means for resolving

issues presented because it has no legal, or principled standards, or authority for political decision

making, no power over defendants, or even plaintiffs who are usually foreign residents except

dismissal,  default judgment and largely unenforceable contempt orders, sanctions and damages.

All the sources of U.S. intelligence and investigative agencies and resources of allies could not

discern whether, or prove Iraq had weapons of mass destruction and even the executive war

against Iraq., and its occupation and search found none.   Are U.S. Courts authorized by the

Constitution and competent to make reliable findings of fact through judicial processes when facts

are so remote, politicized and obscure, so importantly secret,  on matters of such great political

and economic importance and nature, on incomplete evidence from available sources, or evidence

or opinion from executive agencies, interested foreign government reports, agents and persons

beyond the reach of judicial power?

(3) It is impossible for courts to decide questions raised by cases brought under FSIA

§§1605(a)(7) without an initial policy determination by the political branches that a foreign

sovereign is a state sponsor of terrorism, a determination Courts cannot credibly make that itself is a political determination, and as made by the Secretary of State, an executive determination not subject to judicial review that can be changed at any time, as has been seen.

(4) It is impossible for the Judiciary to decide an accused foreign sovereign committed a heinous crime without impugning its honor, by supporting U.S. foreign policy or did not commit one or more  of the four terrorist acts specified in the statutes without at least partially impugning the Secretary of State's finding that  the foreign sovereign  was a state sponsor of terrorism involved in the commission of of such crimes.

(5) The finality of the Secretary of State's finding that the foreign sovereign was a state sponsor of terrorism places undue pressure on the Judiciary for unquestioning adherence to a political decision already made, and subject to change at any time by Congress or the President whether for reasons politically expedient, or highly principled.  .

(6) The potential of U.S. embarrassment for multifarious pronouncements by the judiciary and the political branches on the same questions is present since the political branches often make numerous even inconsistent statements on the specific incidents that come before the courts.  At this time, the President and other officials in both political branches are under great political pressure to speak out on events in Iran where U.S. citizens participating in demonstrations protesting the recent Presidential elections are at risk.

Perhaps nothing more clearly demonstrates the political nature of the foreign policy questions presented to the judiciary by FSIA §§1605(a)(7) and 1605A than the political reversals by the President and the State Department of  designations of foreign sovereigns as sponsors of terrorism applied retroactively to cases in litigation for years and even after final judgment by a

Court of the United States making the judiciary decisions on  which the rule of law ultimately

depends a mere servant of the political branches, dismissible at will.

This has happened with two of the seven foreign sovereigns that have been designated

state sponsors of  terrorism, Iraq and Libya, and is the subject of negotiation with others.  It will

doubtless happen again as alliances and  power relationships change.   Indeed if the removal from

the sponsor of terrorism list reflects a bona fide belief by the executive of a sincere change away

from a previous policy of sponsoring terrorist acts, we should all celebrate.  But we cannot

celebrate  at the expense of our independent judiciary whose final judgments must be inviolable if

we are to live under the rule of law..

See, <u>Applicability to Iraq</u>.  Act Jan. 28, 2008, P.L. 110-181, Div A, Title X, subtitle F,

§1083(d), 122 Stat. 343 empowering the president to waive any provision of this section with

respect to Iraq.  President Bush  made the required determination purporting to remove Iraq from

all proceedings, liability, judgments and jurisdiction under FSIA §1605(a)(7).   The Supreme

Court has now held in <u>Beaty</u> that Iraq's exposure to liability under §1605(a)(7) ended in May

2003 when the President exercised his authority under the Emergency Wartime Supplemental

Appropriations Act , 117 Stat. 559, section 1503 to make the section inapplicable to Iraq and the

District Court lost jurisdiction. See <u>Republic of Iraq</u> v. <u>Beaty</u> , <u>supra</u> at 16.

See, also, <u>Libyan Claims Resolution Act</u> of August 4, 2008, P.L. 110-301, 122 Stat. 2999,

in which it is stated  "Congress supports the President in his efforts to provide fair compensation

to all nationals of the United States who have terror-related claims against Libya through a

comprehensive settlement pursuant to an international agreement between the "United States and

Libya as part of the process of  restoring normal relations between Libya and the United States ."

The Act aborts all previous cases and final judgments against Libya by U.S. citizens under FSIA §1605(a)(7)., including those involving Pan Am flight 103.   The agreement set equal amounts for deaths of U.S. citizens and the U.S. agreed to the amount of $300 million dollars for deaths and destruction from the U.S. air strikes on Tripoli and Benghazi, Libya in 1986.  See, <u>Saltany</u> v. <u>Reagan</u>, 886 F.2d 438 (D.C. Cir. 1989).   Libya has been removed from the state sponsor of terrorism list.

See also, <u>Acree</u> v. <u>Iraq</u>, 370 F.3d 41 (D.C. Cir. 2004) <u>cert.denied</u> 544 U.S. 1010 (2005),  in which 17 U.S. citizens held in Iraq in 1990-91 at the beginning of the Gulf War were awarded over $959 million  in a final judgment of the U.S. District Court in Washington, D.C. only to have it set aside after the Executive Branch intervened to nullify the final judgment of a U.S. District Court.   The <u>Acree</u> plaintiffs then attempted to pursue their complaint in  the District Court which rejected the case because the Court of Appeals in the previous appeal in the case had dismissed the complaint on a separate dispositive issue,   565 F.Supp.2d 128 (D.C.D. 2008)(RWR).   The Court of Appeals summarily affirmed the District Court's refusal to allow further proceedings on the complaint in an unpublished <u>per curiam</u> order,  2009 U.S. App. LEXIS 3281 (D.C. Cir. February 17, 2009).

Justice Scalia explained in <u>Republic of Iraq</u> v. <u>Beaty</u>, op cit. at p. 3, that "Because Iraq succeeded in having the claims against it dismissed on other grounds ... it could not seek certiorari to challenge the D.C. Circuit's interpretation of the EWSAA," the Emergency Wartime Supplemental Appropriations Act which the Supreme Court upheld in <u>Beaty</u>.

On May 4, 2009, Rep. Joe Sestak introduced the Equitable Compensation for American Victims of Torture Act of  2009, H.R. 2241, to compensate the <u>Acree</u> plaintiffs and others  after

42

exhaustive litigation and a final judgment in favor of the <u>Acree</u> plaintiffs was aborted by the

Executive Branch in the exercise of its political powers over the foreign policy of the United

States.

The Judiciary must act now to protect the integrity of its Article III powers to preserve its

independence from legislative and executive political influence and to protect the rule of law.

It is apparent that the efforts of the Congress to confer jurisdiction on federal courts over

cases arising from terrorist acts abroad where foreign sovereigns have sponsored terrorism is

impermissible under the Constitution because it invokes pervasive political questions inherent in

the conduct of foreign affairs that are for the political branches to address.   The foreign policy of

the U.S. will change, as everyone who wants peace must hope, when relations with hostile

sovereigns change.   As Justice Scalia observed in <u>Beaty</u> "Foreign sovereign immunity 'reflects

current political realities and relationships' and its availability (or lack thereof) generally is not

something on which parties can rely 'in shaping their primary conduct.'  <u>Republic of Austria</u> v.

<u>Altmann</u>, 541 U.S. 677, 696 (2004); see also <i>id.</i>, at 703 (SCALIA, J., concurring)."  <u>Beaty</u> , <u>supra</u>,

Op cit Slip Opn at p. 15.   A statute or Executive Order that imperils the finality of judgments is

unconstitutional.   A statute or Executive Order that seeks to impose jurisdiction on U.S. courts to

decide political questions is unconstitutional.

The amendments that added the terrorism exception to the FSIA in April 1996,

empowering the Secretary of State to strip individual foreign sovereigns of their immunity and

vesting jurisdiction in U.S. courts to adjudicate cases alleging any of four terrorist acts committed

against U.S. nationals anywhere in the world, have been great failures, and harmful to our Courts,

their litigants and our foreign relations.   They are an extreme example of inequality, exempting

nearly all nations and threatening crushing damages on poor countries while nearly all victims of terrorist acts never have a day in court and those who do get little or nothing.

Except for default judgments which have been common, only a few cases have reached judgment assessing damages..  The litigation histories of all the cases has been slow and tortured and except for the freezing of funds of Iran, Cuba and perhaps one, or two other countries, some of whose funds frozen by the U.S. have been obtained by parties who had default judgments, few plaintiffs have recovered any significant property, or money for all their efforts and expense.   The litigation has been a frustration for the Courts, time consuming and costly.  Now we have seen even final judgments of U.S. courts voided by Congress and the President.

The January 28, 2008 amendment to the FSIA authorizing freezing of all properties and funds of defendants in the U.S. from the time a case is first filed up to the total amount sought in the complaint is just another example of the political extremes to which the Congress has gone to show how it hates a select few terrorists.  It violates the Fifth Amendment to the Constitution and is fundamentally unfair by depriving defendants of their property on the filing of a complaint against them without any adjudication or other due process of  law.   Such a provision for all civil litigation in the U.S. would create economic chaos, paralyze commerce and drive corporate and individual defendants to desperation.

The major effects of this legislation include extreme frustration and disappointment for many plaintiffs of whom more than a few have fallen by the wayside long before judgment.    For defendants the laws have caused anger and hostility.  For the Executive Branch the result has been impediments to peace processes, occasional interventions into  judicial proceedings and the anger of plaintiffs whose cases, because of delays  even with defaults and those with monetary

44

judgments may be lost because of changed U.S. foreign policy and uncollectible if left to stand.

For the federal Judiciary among the effects have been  some degree of erosion of international confidence in and respect generally held for American courts as non-political, independent and committed to the rule of law.   The statutes reflect an imperial conception of U.S. sovereignty, the world-wide jurisdiction over cases brought by its citizens alone claiming to be victims of terrorist acts and rendering enormous and punitive monetary awards to the select few, the American abroad.  The vast majority of the victims of those same "terrorist" acts have no remedy.   Thousands and more, generally the poor, also victims of terrorism,  often in the same countries have no hope for compensation for deaths and injury and see huge judgments sought and sometimes entered by U.S. courts against their own country  and disregard for the equal sovereignty of other nations.  And see U.S. courts as being so weak that the U.S. Executive can set aside even the finality of its judgments and U.S. courts continue to process cases to whatever frustration they may lead.


IV.     **FSIA §§1605(a)(7) and 1605A Expose the Finality of Judgments of Article III Courts, an Essential Attribute of Judicial Power, to Legislative and Executive Nullification and Are Unconstitutional**

The constantly changing nature of the political questions inherently involved in the conduct of foreign relations by the political branches necessarily limits the jurisdiction that Congress can confer on U.S. Courts by legislation that is closely related to foreign affairs.  As noted above, the Court of Appeals for the District of Columbia has repeatedly observed that foreign relations are "quintessential sources of political questions" Bancroft v. McNamara, 445 F.3d 427 , 433(D.C.Cir. 2006).

All the legislation creating federal court jurisdiction to adjudicate claims for deaths and injuries caused by "terrorist" crimes abroad against U.S. nationals has been enacted in a highly politicized time of emotional fear of terrorism or during the "war on terrorism." The political motivation in the enactments has been manifest at the time, as has their temporal nature.

The probability that U.S. foreign policy toward the targets of the legislation and the exercise of power delegated to the Secretary of State to select sovereigns to be designated sponsors of terrorism would change was not only clear at the time, but was a constant goal of foreign policy makers and proponents of the legislation. Whether by defeating them militarily, or economically, a change in their policies, or the need to form new alliances, our foreign policy seeks to make allies of enemies, or at the very least cool hostility, albeit on acceptable terms.

The change in U.S. foreign policy, however tenuous, has come with two sovereigns heretofore subject to suit under the state sponsor of terrorism exception to sovereign immunity, Iraq and Libya. The changes in policy have wiped out years of extensive judicial toil and dissolved final judgments into nothingness. We can be sure change will come with others, or all, of the remaining five "state sponsors of terrorism." President Obama has expressed his intention to change our relationship with all the selectively designated sponsors of terrorism with Syria apparently high on the list.

Legislation concerned with activity that is inextricably intertwined with foreign policy is an area where Congressional expansion of the jurisdiction of U.S. Courts should be authorized only with great care and scrutinized by the judiciary with the care that the preservation of Judicial independence and the integrity of the Rule of Law require.

The "more perfect Union" was in its infancy when <u>Hayburn's</u> case was filed in a U.S.

Court in 1792.  The Constitution became effective on June 21, 1788.   The first Congress

convened on March 4, 1789.   The Congress established a Supreme Court, 13 district courts and

three ad hoc circuit courts on September 24, 1789.  The Supreme Court composed of a Chief

Justice and five Associate Justices convened for the first time on February 2, 1790.   Supreme

Court members were never closer in time to the drafting of the Constitution and its original

intentions.

      Two of the Justices who reviewed Hayburn's case, James Wilson of Pennsylvania and

John Blair of Virginia, James Madison being Virginia's only other delegate, were delegates at the

Convention and signed the new Constitution.  Wilson was one of the most active and effective

delegates at the Convention.

      The Hayburn Court, alert and concerned for the independence of the judiciary under the

new Constitution, and particularly for the lower courts created by Congress under Article III,

immediately and vigorously objected to the attempt to impose nonjudicial fact finding functions

on judicial officers made reviewable by the Secretary of War as a violation of the new

Constitution.

      The Congress, equally close in time to the birth of the Constitution, with many of its

Members, delegates at the Convention, readily corrected its error.

      "Since 1792 the federal courts have emphasized finality of judgments as an essential

attribute of judicial power."  The Constitution of the United States of America, Analysis and

Interpretation.  99th Congress, 1st Session, Senate Document 99-16 at p. 633.  In 1792 Congress

authorized the filing of pension claims by Revolutionary War veterans in the Circuit Courts.   It

directed the judges to certify to the Secretary of War the amount of the veterans disability and the

Court's  opinion of the percentage of monthly pay to be made, but granted the Secretary authority

to withhold payments to claimants determined by the courts to be entitled to a pension if the

Secretary determined there was some "imposition, or mistake."  Act of March 22, 1792 1 Stat.

243.

 The Justices were themselves on circuit at the time Congress acted almost immediately

they sent their objections to the President, stating the statute was unconstitutional because the

duties imposed by the act were not judicial and subjection of a court's decision to revision, or

control by the executive or legislative branches was not authorized by the Constitution.

 Attorney General Edmund Randolph, informed of the courts refusal to act as directed by

the statute, filed a motion for a writ of mandamus in the Supreme Court, seeking an order directing

the Circuit Court to proceed on the  petition of a veteran named Hayburn who sought a pension.

 The Supreme Court heard argument, but delayed decision, apparently because it learned

that Congress was acting to rescind the objectionable features of the act.  The Supreme Court

dismissed Hayburn's suit.  Hayburn's Case, 2 Dall(2 U.S.) 409 (1792)) and the Congress enacted a

new pension law without the objectionable features, Act of February 28, 2793, 1 Stat. 329.   Some

of the Justices had announced their willingness to serve as commissioners,  but not in their

capacity as judicial officers.    Fortunately the Congress and the Supreme Court understood

immediately in so seemingly minor a matter that the independence of the judiciary and the

integrity of the rule of  law were at risk.

 "Hayburn's Case has since been followed so that the Court has rejected all efforts to give it

and the lower federal courts jurisdiction over cases in which judgment would have been subject to

executive or legislative revision."   The Constitution of the United States, Analysis and

Interpretation, op.cit. at 634, citing United States v. Ferreira, 13 How (54 U.S.) 40 (1852); Gordon

v. <u>United States</u>, 2 Wall. (69 U.S.) 561 (1865); <u>In re Sanborn</u>, 148 U.S. 222 (1893) and <u>McGrath</u>

v. <u>Kristensen</u>, 340 U.S. 162, 167-68 (1950).

To prevent states from altering their voting laws in a way that would interfere with the

participation of minorities, the Voting Rights Act of 1965 (VRA) provided that no State could

"enact or seek to administer" any change in its election law or practice without obtaining the

approval of the U.S. Attorney General or the U.S. District court for the District of Columbia.  The

Supreme Court later held this provision of the VRA to apply to state reapportionment and

redistricting of voting districts since such legislation could interfere with the purposes of the

VRA.  Federal courts, when they reject redistricting  plans drawn by state legislatures for failure

to adequately protect voting rights, approve and order redistricting plans resulting from litigation

before them to protect voting rights.

The question in <u>Connor</u> v. <u>Johnson</u>, 402 U.S. 690 (1971) was whether the order of a

federal court approving voting district plans had to be submitted to the Attorney General, or the

U.S. District Court for D.C., circumstances not foreseen in the drafting and enactment of the

VRA.

The Supreme Court in <u>Connor</u> ruled on the papers before it without oral argument that

despite the inclusive language of the VRA, it did not apply to plans ordered by U.S. Courts, thus

saving vital civil rights legislation after six years of implementation, and the rule of law and

independence of the judiciary

The full force of <u>Hayburn's Case</u>  remains intact after more than two centuries.   Later

decisions that federal judges can act as individuals in non judicial matters, but not in their judicial

capacity, without impairing the independence of the judiciary, or the integrity of the rule of law,

do not affect the principle of the finality of judgments of Article III courts.  See, e.g., <u>Mistretta</u> v.

United States, 488 U.S. 361, 397-408(1989) which approved the personal service of three sitting Article III judges on the U.S. Sentencing Commission and reviewed many historical instances of federal judges serving in many roles as individuals.

Undoubtedly judicial experience is invaluable in many circumstances and judges should not be arbitrarily excluded from contributing their experience and wisdom to projects and activities that will not interfere with their judicial service, or create conflicts of interest..

As noted, some of the Justices who sat in Hayburn's case itself declared their willingness to perform under the Congressional act as commissioners, but not as Article III judges, a gesture that could have weighed heavily on the ability of the individual volunteers to perform their judicial duties if the number of veterans filing claims for pensions proved great.

The very concept of anti-terrorism and sponsorship of terrorism laws may have been good politics, but it is impermissible law when it seeks to involve the Judiciary in foreign policy decisions.  It potentially extends U.S. court jurisdiction wherever on the planet, or elsewhere, U.S. citizens roam placing it in competition, if not conflict, with the jurisdiction of other nations' courts and the constitutional powers vested in the political branches to decide all foreign policy questions.

FSIA §§1605(a)(7) and 1605A require judicial intrusion into the inner sanctums of other nations most secret foreign policies and activities where it will rarely and unreliably be admitted to obtain evidence for determining facts to decide the political questions raised by all such cases.

By the huge awards that Courts have entered, the litigation hast seriously malapportioned resources available to compensate the tragic deaths and repair destruction wrought by terrorism while inflaming passions at its discrimination against the masses of victims who have no remedy.

As Justice Scalia observed in <u>Beaty</u> "What would seem perplexing is converting a billion-dollar reconstruction project into a compensation scheme for a few of Saddam's victims." <u>Beaty</u>,, <u>supra</u> at p. 15.  A unanimous Supreme Court has ruled " ... the District Court lost jurisdictiion over both suits in May 2003, when the President exercised his authority to make §1605(a)(7) inapplicable with respect to Iraq.  At that point, immunity kicked in and the cases ought to have been dismissed." <u>Republic of Iraq</u> v. <u>Beaty</u> op cit. at p. 16.  "When the President exercised his authority to make inapplicable with respect to Iraq all provisions of law that apply to countries that have supported terrorism, the exception to foreign sovereign immunity became inoperative against Iraq". Id. at p.17. 17.

The total failure of legislation involving U.S. courts in cases presenting political questions involved in alleged sponsorship of terrorism by foreign governments under FSIA §§1605(a)(7) and 1605A is manifest in the trail of broken cases that legislation has left behind..

FSIA §§1605(a)(7) and 1605A are unconstitutional because they place highly inflammatory political questions before the judiciary and expose the finality of Article III Court judgments to the political will of the Congress and the President in conducting the foreign relations of the United States.

**V.      The complaint's allegations that Syria provided massive support and resources of all kinds for a terrorist shooting in 1991 and a terrorist bombing in 2002 allegedly committed by the PLO are general, conclusory and boilerplate, and inadequate to provide the nexus and causation between the alleged general support and the two violent events at issue required to establish  jurisdiction under FSIA §§1605A and 1605(a)(7).**

The four complaints plaintiffs have filed asserting claims against Syria are devoid of any allegation of any act or conduct by any defendant except in entirely conclusory terms.

Plaintiffs are relying on their allegations Syria provided massive general support and resources

This is not a case in which the state designated as a sponsor of terrorism is alleged to have

committed or participated in one of the four kinds of terrorism listed in §1605(a)(7).   This is not

a case of alleged imprisonment and  torture by a state as many cases are.  Nor is it a case of more

elaborate wrongdoing by a designated state,  see e.g. the wrongdoing by Libya's agents in

Beecham v. Socialist People's Libyan Arab Jamahiriya, 424 F.3d 1109 (D.C. Cir. 2005) and

Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123 (D.C. Cir. 2004), discussed

infra

The complaint's allegations of support are entirely general, conclusory and

boilerplate and are not tied to either the "terrorist shooting" or the "terrorist bombing."  For

example, under the heading THE TERRORIST SHOOTING where one would expect to find the

allegation of a nexus between the shooting and support, if there is one, the complaint alleges

merely the Syrian defendants "continued to conspire with and systematically provide massive

material support and resources ..." (¶48), and further, the terrorist shooting was carried out

"utilizing funds, weapons, terrorist training and other material support, resources, aid and

assistance provided by the Syrian defendants..." (¶58).

The support described under the heading THE TERRORIST BOMBING is equally

without focus and nexus, alleging that the Syrian defendants "continued to conspire with and

systematically provide massive material support and resources..." (¶60); the bombing was carried

out utilizing funds, explosives, terrorist training and other material support, resources, aid and

assistance provided by the Syrian defendants (¶68).

With respect to the Syrian Arab Republic and each of the other six Syrian defendants the

complaint alleges in identical terms that the defendant "provided material support and resources

for the commission of acts of extrajudicial killing, .. including the terrorist bombing and the

terrorist shooting,"   ¶18 Syrian Arab Republic; ¶19  The Syrian Ministry of Defense; ¶20

Mustafa Tlass; ¶21 Syrian Military Intelligence; ¶22 Hassan Khalil; ¶23 Assef Shawkat; ¶24 Ali

Douba; ¶25 Syrian Air Force Intelligence Directorate and ¶26 Ibrahim Hueija.   Elsewhere the

complaint tracks the kinds of support enumerated in the definition of support in 18 U.S.C.

§2339A(B),  always in general terms expansively stated see e.g. ¶'s 34 - 37.   The complaint

claims there was "an agreement reached between Syria and the PLO and its organs in 1968,"

which remains in force today," ¶33.   A reading of the complaint compels the conclusion that

plaintiffs know of no basis for tying Syria to the shooting or the bombing sufficient to establish

jurisdiction under §1605(a)(7) or §1605A..  Given the vast scope and generality of their

allegations of support, plaintiffs are hoping, one supposes, to launch through "jurisdictional

discovery" their private inquiry into Syria's foreign policy and national security measures with

respect to Palestine in the hope of securing the multi-million dollar civil recoveries, including

punitive damages,  the complaint is demanding.  To subject a sovereign foreign state to such an

inquiry into sensitive areas of national security by private civil litigation would be an awful and

unprecedented repudiation of equal sovereignty.

     The generality of plaintiff's complaint contrasts strikingly with the allegations of nexus

and direct action by Libya in <u>Kilburn</u> and <u>Beecham</u>.

     In both <u>Kilburn</u> and <u>Beecham</u> a clear nexus and direct participation in terrorist acts were

charged, not simply general support as in the present case.

     <u>Kilburn</u> states:

... we underline that the only issue before us here is jurisdictional causation, because §1605(a)(7) is solely a jurisdictional provision. Cicippio-Puleo, 353 F.3d at 1032. To succeed in the end, the plaintiff must go beyond jurisdiction and provide proof satisfying a substantive cause of action. Id. ... Whatever the ultimate source may be, it will no doubt carry with it--as a matter of substantive law--its own rules of causation. ...

In this case, there is no doubt that the plaintiff's allegations satisfy the proximate cause standard. The complaint alleges that, after the United States bombed  [*1130]  Tripoli, "Libyan agents in Lebanon made it known that they wanted to purchase an American hostage to murder in retaliation." Compl. P 13. It specifically asserts that Peter Kilburn "was purchased and killed by members of the Arab Revolutionary Cells," id. P 21, "whose acts were funded and directed by Libya," id. P 26 (emphasis added). A subsequent declaration makes clear that the plaintiff's allegation is not just that ARC was "supported" and "funded" by the Libyan government, but that it was "directed" by that government "and acted as its agent in Lebanon to carry out terrorist activities, including the purchase and assassination of Peter Kilburn." Decl. of Ambassador Robert Oakley (Ret.) P 14 (hereinafter "Oakley Decl."). If proven, these allegations are more than sufficient to establish that the acts of the Libyan defendants were the proximate cause of Peter Kilburn's injury and death.

The complaint in <u>Beecham</u> similarly alleges a clear nexus and direct terrorist acts:

Plaintiffs are victims and estate representatives of victims injured or killed in the 1986 bombing of the "La Belle" discotheque in West Berlin, Germany. Their complaint alleges as follows. Defendant [**2]  Colonel Muammar Al-Ghaddafi, head of the Libyan government, directed Libyan agents to plan, prepare, and execute the attack. Libyan agent Souad Chraidi transported plastic explosives, a detonator, and a timing device from the Libyan embassy in East Berlin to an apartment in West Berlin. Chraidi and others made the final preparations for the attack, fitting the detonator and timer to the explosives, which they concealed in a bag for delivery to the discotheque. On the night of the bombing, Verena Chanaa and Andrea Hausler brought the bomb to the discotheque, where they activated the timing device, placed the bomb at a seat in the center of the dance floor, and left. In the early morning hours of April 5, 1986, the bomb exploded with approximately 260 people inside the discotheque. Three people

54

were killed and more than two hundred injured.

> Among other things, plaintiffs point to telex communications
> between Libyan intelligence in Tripoli and the Libyan embassy in
> East Berlin confirming defendants' responsibility for the attack.
> Colonel Al-Ghaddafi purportedly admitted as much to a German
> ambassador in a meeting in 2001.

In the present case, the complaint charges Syria solely with support repeatedly embellished by conclusory allegations of conspiracy, aiding and abetting, acting in concert and in pursuit of a common goal and design, and the like, see e.g. paras. 54 and 55, and not with the commission itself of any of the four acts of terrorism listed in §1605(a)(7).

The allegations are too general and conclusory to satisfy FSIA §1605(a)(7). The need for details and specificity in alleging the furnishing of material support and resources under FSIA §1605(a)(7) was addressed by this Court in Owens v. Republic of Sudan, 374 F.Supp.2d 1, 14-16 (D.D.C. 2005) (JDB) relying principally on the analysis of the Court of Appeals  in Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82 (D.C. Cir. 2002) with respect to allegations of acts of terrorism under FSIA §1605(a)(7) such as torture and hostage taking.   The Court in Owens said:

> . . .the Court concludes that the meaning of "material support" must
> be alleged with a degree of specificity sufficient to determine that
> they "state a proper claim for [the provision of material support or
> resources] under the FSIA." Price, 294 F.3d at 94. The complaint in
> this case fall short of that standard. Plaintiffs make several
> conclusory allegations that the Sudan defendants provided "cover",
> "support", and "sanctuary" to al Qaeda and Hizbollah, Compl. PP 2,
> 7, a single allegation that the Sudan defendants entered into an
> unspecified [**38]  agreement with al Qaeda and Hizbollah through
> which those organizations received "shelter and protection from
> interference," id. P 8, and a single allegation that a meeting occurred
> in the Republic of Sudan between the leaders of al Qaeda and
> Hizbollah to plan the embassy attacks, id. These allegations do not
> provide enough information to determine the nature of any

55

> relationship between al Qaeda and Hizbollah, the form the alleged
> acts of "support" took, and whether those acts qualify as "material
> support or resources" within the meaning of the statute. The
> complaint "in its present form is simply too conclusory to satisfy §
> 1605(a)(7)." Price, 294 F.3d at 85.

Judged by this standard the complaint's allegations of material support in this case are too

conclusory to satisfy FSIA §1605(a)(7).  Because the violence at issue in <u>Owens</u> was notorious,

high profile and intensively investigated -- the simultaneous explosion of truck bombs at U.S.

Embassies in Tanzania and Kenya, killing hundreds and injuring thousands it was likely from

publicly known facts that plaintiffs could state their allegations in  greater detail and overcome

the deficiencies  in the complaint's conclusory pleading, the Court in <u>Owens</u> gave plaintiffs leave

to amend their complaint.   There is no equivalent basis in the present case to believe the

plaintiffs in their present fourth complaint can allege nexus and causation sufficient to establish

jurisdiction under FSIA §1605(a)(7).

Plaintiffs make repeated use of the word "specific," undoubtedly seeking to cure the

generality of the complaint.   For a few examples, see "specific intention" in paras. 32, 35,

37,38,48 and 60; and "specific purpose" – paras. 58, 64 and 68   This rhetorical device fails.  The

phrases with which plaintiffs have sprinkled the complaint are no more meaningful and

informative  than the words themselves unadorned by "specific."

Again and again, the complaint's allegations are conclusory and fail to allege sufficient

causal connections between the support alleged in general terms,  and the deaths in the shooting

attack in 1991 and the bombing attack in 2002,  except in conclusory terms, alleging for example

that the terrorist shooting attack was carried out by the "PFLP faction of the PLO

> utilizing funds, weapons, terrorist training and other material
> support, resources, aid and assistance provided by the Syrian

56

> defendants for the specific purpose of carrying out that terrorist
> shooting and other such acts of extrajudicial killing and
> international terrorism.

Complaint, para. 58.  The complaint employs similar language with respect to the bombing attack, para. 68.

Plaintiffs allegation of proximate cause in paragraph 85 of the complaint serves to confirm the absence of such cause:

> 85.  Defendants' actions were willful, malicious, intentional,
> wrongful, unlawful, negligent and/or reckless and were the
> proximate cause of the terrorist shooting and the terrorist bombing
> and the deaths of decedents Yair Mendelson, Keren Shatsky and
> Rachel Thaler.

Syria disagrees with the case law that imposes upon a foreign sovereign the burden of proving its entitlement to immunity,  see e.g. Kilburn, 376 F.3d at 1133, citing Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000).  We have found  no U.S. Supreme Court decision  that so holds, a holding that is particularly unlikely in a case like this one, where there is no question the defendant is a foreign state for purposes of the FSIA,  and the statutory criteria for loss of something as crucial to Syria as its immunity in the courts of what is regrettably, but unquestionably, an unfriendly government, purporting to apply in its Courts laws that are extremely hostile and unfair under FSIA §1605(a)(7) and the more arbitrary and draconian terms of §1605A.

**Conclusion**

Syria's motion under Rule 12(b) should be granted, and this case dismissed, with prejudice.

Dated: New York, NY                          Respectfully submitted,

June 22, 2009                                    /s/

Ramsey Clark DC Bar No. 73833
/s/
Lawrence W. Schilling
37 W. 12 th St.
New York, NY 10011
212-989-6613 fax 212-979-1583
email: lwschilling@earthlink.net

Attorneys for the Syrian Arab Republic