UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHABTAI SCOTT SHATSKY, *et al.*,

Plaintiffs,

-against-

THE SYRIAN ARAB REPUBLIC, *et al.,*

Defendants.

Civil Action No. 08-496 (RJL)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR ENTRY OF JUDGMENT BY DEFAULT ON LIABILITY**

Asher Perlin (#FL0006)
LAW OFFICE OF ASHER PERLIN
4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
786-687-0404
asher@asherperlin.com

*Counsel for the Mendelson Plaintiffs*

Abbe David Lowell (#358651)
WINSTON & STRAWN, LLP
1901 L Street, N.W.
Washington, D.C. 20036
adlowell@winston.com

Joy L. Langford (#451728)
NORTON ROSE FULBRIGHT
901 H Street, N.W.
Washington, DC 20036
Tel: (202) 974-5605
Fax: (202) 974-6705
joy.langford@nortonrosefulbright.com

*Counsel for the Shatsky Plaintiffs*

February 21, 2023

The Plaintiffs respectfully submit this Memorandum in support of their Motion for Entry of Judgment by Default against Defendant Syrian Arab Republic ("Syria").

## INTRODUCTION

This is a civil action under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, arising from two terrorist attacks carried out by the Popular Front for the Liberation of Palestine ("PFLP") in which American citizens were killed and suffered personal injuries. In the first attack, on March 26, 1991 ("Mendelson Attack"), Yair Mendelson, the husband of U.S. citizen plaintiff Miriam Mendelson Miller Itay, was machine-gunned to death while driving his car, and a U.S. citizen, plaintiff Elizabeth Har-Zahav, suffered injuries. Plaintiffs Miriam Miller Itay and Elizabeth Har-Zahav are referred to jointly as the "Mendelson Plaintiffs."[2] In the second attack, a suicide bombing in a pizzeria on February 16, 2002 ("Shatsky Attack"), U.S. citizens Keren Shatsky and Rachel Thaler were killed, and plaintiffs Leor Thaler, Hillel Trattner, Chana Friedman, and Steven Braun, all U.S. citizens, were seriously wounded. The plaintiffs whose claims arise from the Shatsky Attack, who are the estates and family members of decedents Keren Shatsky and Rachel Thaler, as well as Leor Thaler, Hillel Trattner, Chana Friedman, Steven Braun and their family members, are referred to collectively as the "Shatsky Plaintiffs."

The defendants in this case are the Syrian Arab Republic ("Syria") and several senior Syrian officials and governmental entities that provided extensive material support and resources to the PFLP for many decades. DE 1.

[2] Plaintiff Miriam Miller Itay was named in this action as "Miriam Mendelson Miller." But as explained in her attached declaration (DE 59), since that time she has stopped using the name "Mendelson." However, for the sake of consistency with the prior filings in this case, Plaintiffs continue to refer to the two plaintiffs whose claims arise from the 1991 attack in which Yair Mendelson was murdered as the "Mendelson Plaintiffs," and to refer to that attack as the "Mendelson Attack."

Service of process in this action on Syria and the Syrian governmental entity defendants was effectuated pursuant to FSIA § 1608(a)(4) through diplomatic channels. DE 17.[3] Those Defendants filed a Fed. R. Civ. P. 12(b) motion to dismiss on jurisdictional grounds that was denied by the Court on February 25, 2010. Following denial of their Rule 12(b) motion, Defendants did not file an answer. Defendants' willful failure to file an answer following denial of their Rule 12(b) motion conformed with their expressly-stated intention of defending this case on jurisdictional grounds only. DE 19 at 29 ("The Syrian Arab Republic has responded to this lawsuit brought against it in U.S. Courts … solely to contest U.S. claims to jurisdiction over it.").

Following Defendants' failure to file an answer, plaintiffs requested entry of default against the Defendants, pursuant to Fed. R. Civ. P. 55(a). Defendants' defaults were duly entered on March 19, 2010 (for the Syrian government entities) and March 22, 2010 (for Syria itself). DE 25-26.

This action is therefore ripe for judgment by default. However, while the three Syrian entity defendants were named and served, they are merely political subdivisions of Syria, legally identical to Syria itself. *Cf. Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *7 (D.D.C. Sept. 28, 2018) (Syrian Air Force Intelligence is the foreign state itself); *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 74 (D.D.C. 2011) (same). Therefore, because each of the Syrian governmental defendants here "is treated as the state itself under the FSIA ... Syria is the only Defendant in this case against whom damages can be sought." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 64 (D.D.C. 2008), *aff'd*, 646 F.3d 1 (D.C. Cir. 2011).

Accordingly, Plaintiffs seek default judgment against Syria, which "is the only Defendant in this case against whom damages can be sought." *Gates*, 580 F. Supp. 2d at 64.

---

[3] The individual defendants were not served and can be dismissed from this action.

The entry of default judgment against a foreign state defendant is governed by FSIA § 1608(e), which provides in relevant part: "No judgment by default shall be entered by a court of the United States ... against a foreign state ... unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." Thus, despite the foreign state defendant's failure to defend, "the entry of a default judgment is not automatic." *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). *Cf. Mark v. Islamic Republic of Iran*, ___ F.Supp.3d ____, 2022 WL 4103854, at *1 (D.D.C. Sept. 8, 2022). Rather, under the FSIA, plaintiffs must establish their claims or right to relief by proffering evidence that is "satisfactory to the court." 28 U.S.C. § 1608(e). *Cf. Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief."); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014) (discussing flexible evidentiary standards when state sponsors of terrorism default and access to evidence is limited).

To establish Syria's civil liability for the two terrorist attacks from which this action arises, Plaintiffs previously submitted to the Court the extensively detailed declaration testimony of renowned terrorism experts Dr. Matthew Levitt (two declarations), Prof. Daniel L. Byman, Dr. Jonathan Spyer, and Arieh Dan Spitzen (two declarations), the foundational declarations of Itzhak Ilan and Avi Har Zahav, as well as supporting documentation. DE 49-52.

In actions under the FSIA's terrorism exception, "testimony of expert witnesses is of crucial importance … because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain. …. The sovereigns themselves often fail to appear and to participate in discovery… With a dearth of firsthand evidence, reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception. … Indeed, cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or

both under the terrorism exception to the FSIA and in other terrorism cases based solely upon expert testimony." *Owens v. Republic of Sudan*, 864 F.3d 751, 787-788 (D.C. Cir. 2017), (cleaned up), *vacated in part on other grounds*, 140 S. Ct. 1601 (2020). *Fields v. Syrian Arab Republic*, No. CV 18-1437 (RJL), 2021 WL 9244135, at *6 (D.D.C. Sept. 29, 2021) (same).

While any or all of the Plaintiffs' experts can provide live testimony if the Court so directs, it is well established that FSIA § 1608(e) does not require an evidentiary hearing. "An evidentiary hearing is not required; a plaintiff may establish proof by affidavit, declarations, or other written materials as plaintiffs can otherwise obtain." *Neiberger v. Islamic Republic of Iran*, 2022 WL 17370239, at *1 (D.D.C. Sept. 8, 2022), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sept. 30, 2022) (cleaned up) (quoting cases). *Cf. Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 20 (D.D.C. 2009) ("In [FSIA] default judgment cases, plaintiffs may present such evidence in the form of affidavits or declarations rather than through live witnesses testifying in open court."); *Fields v. Syrian Arab Republic*, Civ. No. 18-1437 (RJL), 2021 WL 9244135 (D.D.C. Sept. 29, 2021) (entering default judgment against Syria without a hearing, on the basis of expert affidavits and documentary evidence submitted by plaintiffs).

FSIA § 1605A authorizes courts to "appoint special masters to hear damage claims brought under this section." 28 U.S.C. § 1605A. Therefore, it has become commonplace for courts in this district to address liability first and, upon a finding of liability, refer the case to a special master for findings as to the plaintiffs' damages. This is particularly so where, as here, there are a large number of plaintiffs. "The Court finds that appointing a special master in this case, as it has done in other multiple-plaintiff FSIA terrorism actions, would not create unreasonable expense or delay and would help efficiently resolve this action." *Bathiard v. Islamic Republic of Iran*, 2019 WL 3412983, at *5 (D.D.C. July 29, 2019). *Cf. Worley v. Islamic Rep. of Iran*, 75 F. Supp. 3d 311,

338-39 (D.D.C. 2014) (discussing court's adoption of Administrative Plan Governing Special Masters); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75 (D.D.C. 2019); *Kaplan v. Central Bank of the Islamic Rep. of Iran*, 55 F. Supp. 3d 189, 200 (D.D.C. 2014).

Given the large number of Plaintiffs in this action, the limits on the Court's resources, and in the interests of judicial economy, Plaintiffs respectfully request that, after entering partial judgment against Syria on liability, the Court refer the matter of Plaintiffs' damages to a Special Master appointed pursuant to § 1605A(e), and that following the Court's receipt and review of the Special Master's damages report and recommendations, it enter final judgment against Syria.

Therefore, and for the reasons set forth below, Plaintiffs respectfully request that the Court (i) enter judgment on liability against Syria; (ii) refer the matter of Plaintiffs' damages to a Special Master appointed pursuant to FSIA § 1605A(e); and then, after reviewing the Special Master's damages report and recommendations (iii) enter final judgment by default against Syria.

## FACTUAL BACKGROUND

## I. THE MENDELSON ATTACK (THE MARCH 26, 1991 SHOOTING)

### A. Expert Witnesses.

As discussed above, in actions under FSIA § 1605A, the "testimony of expert witnesses is of crucial importance" and "cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA and in other terrorism cases based solely upon expert testimony." *Owens*, 864 F.3d at 787-788. *Cf. Fields*, at *6 (same).

To establish Syria's liability for the Mendelson Attack (the terrorist shooting on March 26, 1991), the Plaintiffs have submitted declarations from three expert witnesses:

**1. Col. Arieh Dan Spitzen (Ret.)**.

Arieh Dan Spitzen is a recognized expert on Palestinian terrorist organizations, who has provided expert testimony in numerous civil actions in the United States federal courts. Declaration of Arieh Dan Spitzen ("Spitzen I"), DE 51 ¶¶ 1-13. Mr. Spitzen is the former Department Head for Palestinian Issues in the Administered Territories in the Israeli Ministry of Defense's Coordinator of Government Activities in the Territories ("COGAT"). He held the rank of Colonel. *Id*. ¶¶ 3, 6, 7. He is an expert on Palestinian affairs and society and the structure, leadership, personnel, and activities of various Palestinian terror groups, including the PFLP. *Id*. ¶¶ 7-8, 25 at n.11. From 1981 until 1993, Mr. Spitzen served as Head of the Research Section in the Israel Defense Force's ("IDF") Office for the Advisor for Arab Affairs in the West Bank and as Deputy Advisor. *Id*. ¶ 4. In those positions, he researched the socio-economic and political situation of the Palestinian population and prepared and supervised the preparation of hundreds of research papers, staff papers, articles, anthologies and studies in Palestinian matters, which were used and relied upon by high level Israeli government officials. *Id*.

Between 1993 and 1996, Mr. Spitzen was a member of the team that negotiated the Oslo Accords between Israel and the Palestinians and in particular negotiated the transfer of authority from the IDF Civil Administration to the Palestinian Authority. *Id*. ¶ 5. Between 1998 and 2000 Mr. Spitzen served as the IDF Civil Administration's Department Head for Palestinian Affairs in the West Bank. *Id*. ¶ 6. From 2001 to 2009, Mr. Spitzen was Department Head for Palestinian Affairs in the West Bank and Gaza and the Advisor to COGAT. *Id*.

Mr. Spitzen became the top authority on the socio-economic civilian situation in the West Bank and Gaza, and was responsible for writing or supervising the writing of hundreds of surveys and studies about political and social trends, the economic atmosphere and its influence, and other

diverse issues connected to the Palestinian arena. *Id*. In this capacity, his research included the activities of the PFLP and other terror organizations. *Id*. During his service, Mr. Spitzen frequently lectured on Palestinian affairs in various forums, including meetings sponsored by universities and research institutes. *Id*. ¶ 11.

Mr. Spitzen continued to serve in the IDF Reserves until 2021 as an emergency Department Head for Palestinian Affairs in COGAT. *Id*. ¶ 8. He is currently an independent consultant in matters of Palestinian affairs. His clients include government agencies, research institutes, and private parties. *Id*. ¶ 9. Mr. Spitzen has served as an expert witness on Palestinian terrorism in numerous United States federal civil lawsuits and in dozens of cases in Israel, including cases in the Israeli Supreme Court. *Id*. ¶¶ 7, 10.(*Cf.* Curriculum Vitae, Arieh Dan Spitzen, detailing his qualification as an expert witness in U.S. federal courts. (DE 51-1)).

Mr. Spitzen's declaration regarding the Mendelson Attack was docketed as DE 51. Mr. Spitzen discusses the operational details of the March 21, 1991, shooting attack, and the facts demonstrating that the shooting was carried out by the PFLP.

**2. Dr. Daniel L. Byman**.

Dr. Daniel L. Byman is an expert on the Middle East, terrorism, and national security. Declaration of Daniel Byman, DE 49-1 ("Byman"), 1-3. Dr. Byman began his professional career as an analyst for the Central Intelligence Agency, and later moved to the RAND Corporation. *Id*. 1-2. He then served the House and Senate Intelligence Committees as one of four team leaders in the joint investigation of the intelligence community's performance with regard to the September 11, 2001, terrorist attacks (the "9/11 Inquiry"). *Id*. 2. He continued his counterterrorism work when he joined the National Commission on the Terrorist Attacks upon the United States. *Id*.

In 2003, Dr. Byman became a tenured faculty member at Georgetown University's Edmund A. Walsh School of Foreign Service, and since 2015 he has been the Vice Dean for the undergraduate program, supervising approximately 1,400 students. *Id*. He teaches classes on terrorism, Middle East security, and other topics related to U.S. national security. *Id.* 2-3.

Dr. Byman is also a senior fellow at the non-partisan Brookings Institution's Center for Middle East Policy. *Id.* 3. He is a regular consultant to the U.S. government and various corporations on terrorism and national security-related matters. *Id.* Dr. Byman has published dozens of articles for peer-reviewed academic and policy journals. *Id*. A full list of his publications is submitted with his *curriculum vitae*. Dr. Byman has also performed numerous classified terrorism-related studies that are not included in the list. *Id*.

Many of Dr. Byman's published books relate to the subject of his expert opinion herein. *Id.* Dr. Byman has appeared as an expert witness on terrorism in courts of the United States and Canada. *Id.* He has also testified several times before the United States Congress on issues of the Middle East, terrorism, and related security matters. *Id.*

Dr. Byman's declaration discusses the goals and motivations underlying Syria's decades-long policy and practice of providing material support and resources to the PFLP, and of maintaining an alliance and a patron-proxy relationship with the PFLP. He explains the function and purpose of the Syria-PFLP relationship within the greater context of Middle East politics and international relations, and how that relationship benefits the Syrian government. Dr. Byman's report was docketed as DE 49-1.

**3. Dr. Matthew Levitt**.

Dr. Matthew Levitt is a noted expert in international terrorism, with a focus on Middle East terrorist groups, with particular expertise in terrorist groups' logistical and financial support

networks. He has provided expert testimony in numerous civil and criminal proceedings in the U.S. federal courts. Declaration of Matthew Levitt, DE 49-2 ("Levitt I") at 5; Curriculum Vitae, DE 58. Dr. Levitt is presently Senior Fellow and Director of the Stein Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy. *Id*. 3. Dr. Levitt holds both a Master of Law and Diplomacy (MALD) and a Ph.D. in International Relations from the Fletcher School of Law and Diplomacy at Tufts University. *Id*. 2. Dr. Levitt has held numerous counter-terrorism positions in the U.S. government and in the private sector. *Id*. at 2-3.

In 2021 Dr. Levitt published a monograph on PFLP abuse of non-governmental organizations entitled, *A Blurred Line between Civil Society and Terrorism: Examining Charges of NGOs Funding the PFLP* (Washington Institute, November 2021). *Id*. Dr. Levitt has testified as an expert in numerous federal cases, and one federal court described Dr. Levitt's research methodology as "the gold standard." *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005). In a watershed ruling upholding the constitutionality of the material support statute, 18 U.S.C. § 2339B, the Supreme Court of the United States has twice cited Dr. Levitt's work. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010).

Dr. Levitt discusses the ideology of the PFLP and the background to its designation by the United States as a Foreign Terrorist Organization. Dr. Levitt also explains how the material support and resources provided by Syria to the PFLP during the relevant period enabled and facilitated the execution of terrorist attacks by the PFLP. Additionally, he addresses how the symbiotic alliance between Syria and the PFLP advances the goals of each. Dr. Levitt's declaration was docketed as DE 49-2.

**B. The Shooting.**

At approximately 8:15 pm on March 26, 1991, PFLP terrorists opened machine-gun fire from a road-side ambush on a private civilian car driven by Yair Mendelson. Spitzen I, DE 51 ¶ 20. Yair Mendelson was struck and killed by the gun fire. *Id*.

Elizabeth Har Zahav, who had been a close friend and neighbor of Yair and Miriam Mendelson (now Miriam Miller Itay) for many years, was driving home from a shopping trip to Jerusalem when she arrived at the scene of the terrorist shooting immediately after Yair Mendelson was shot. Declaration of Elizabeth Har Zahav (DE 60) ("E. Har-Zahav") ¶¶ 3, 6, 7, 9, 10.[4] Despite the great danger to herself, Elizabeth approached the Mendelsons' car and opened the door to find Yair Mendelson, her friend and neighbor, slumped over in the driver's seat. *Id* ¶ 10. Elizabeth radioed for help and sought to provide Yair Mendelson with first aid. *Id* ¶¶ 11, 13. But when Elizabeth touched Yair's head to try to clear an airway for him to breathe, she discovered to her shock and horror that Yair's head was so badly injured that she was sure he was dead. *Id* ¶ 13.

Help did not arrive quickly. The Attack occurred in a remote area, and Yair Mendelson, himself, was the local ambulance driver. *Id* ¶ 12. Elizabeth understood that the shooting had just taken place. *Id* at ¶¶ 7, 16. She feared for her own life and the lives of her children and mother-in-law who were sitting in her car. *Id* ¶¶ 4, 14. She told her family not to exit the car. She did not want them to see Yair's corpse. *Id* ¶14.

[4] The declarations of Plaintiffs Elizabeth Har Zahav, Miriam Miller Itay, Shabtai Scott Shatsky, Lior Thaler, Chana (Friedman) Edri, Hillel Trattner and Steven Braun have been submitted for the limited purpose of establishing—as elements of subject-matter jurisdiction and liability—the U.S. citizenship of the claimants and the victims, and the fact that they suffered some harm as a result of the attacks from which this action arises. It should be emphasized that these declarations are intended solely to establish U.S. citizenship and the **fact** of injury, as elements of jurisdiction and liability, but **not** to prove the extent or quantum of damages. At the damages stage, the Plaintiffs will submit detailed evidence of their damages.

Elizabeth, who worked as a school psychologist, was eventually asked to break the horrific news of Yair's murder to his young widow, Miriam ("Mikki"). *Id* ¶ 17. Following the Attack, Elizabeth suffered from fear and terrible sorrow. ¶¶ 18-20 She experienced flashbacks and avoidance responses. *Id*. Her pain and distress continue to this day. *Id*.

Yair Mendelson left behind his young widow, Plaintiff Miriam (Mendelson) Miller Itay, and their three children, then-aged nine, seven, and two years old. Declaration of Miriam Miller Itay (DE 59) ("Miller Itay") ¶ 6. Miriam had married Yair when she was only eighteen years old. *Id*. ¶ 5. The two enjoyed a warm, loving, and happy marriage that lasted eleven years until Yair was brutally murdered. *Id*.

Miriam was devastated by her husband's murder, which left her three children orphaned. *Id*. ¶ 6. The murder of her husband caused Miriam unspeakable emotional pain, trauma and grief and left her with deep emotional scars. *Id*. ¶ 11.

**C. The PFLP carried out the Mendelson Attack**.

Based upon direct evidence, Mr. Spitzen concluded that "there is no reasonable doubt that the PFLP carried out the March 26, 1991 attack" in which Yair Mendelson was killed. Spitzen I (DE 51) ¶¶ 18, 31. Mr. Spitzen reviewed the police file relating to the Mendelson Attack. *Id*. ¶ 19, and Exhibit A (DE 51-2).[5] The police file includes a forensic crime scene report dated May 20, 1991. The forensic report is titled, "The Murder of Yair Mendelson, A-Tira – Ein Qinya Road." *Id*. ¶ 19. The police file also contains an internal Israel Police telegram that was sent on June 3, 1991 to several units of the Israel Security Agency and the Israel Police discussing the results of

[5] Though expert witnesses such as Mr. Spitzen may rely on materials that are not themselves admissible (Fed. R. Evid. 703), the Mendelson Plaintiffs have adopted a belt-and-suspenders approach, and have submitted the Declaration of Avi Har Zahav (DE 49-3), in order to provide an additional evidentiary foundation for the police file. The facts set forth in that declaration establish that the police file is independently admissible under Fed. R. Evid. 803(8), 803(16) and 901(8).

various ballistics tests performed upon bullet casings found at the scenes of various terrorist attacks (the "Ballistics Telegram"). *Id*. ¶ 21, and at Exhibit B (DE 51-3).

The crime scene report states that Yair Mendelson was shot and killed in a road-side ambush while driving on the A-Tira – Ein Qinya Road, just east of the village of Ein Qinya. *Id*. ¶ 20. Mr. Spitzen found that the ambush bore the hallmarks of a professional attack carried out by a well-established organization that fields trained operatives. *Id*. Among other things, the terrorists positioned themselves at a height from which they could conduct surveillance and from which their gun-fire would dominate the road. *Id*. The vegetation where the terrorists had concealed themselves during the attack was thick and provided the terrorists with good cover. *Id*. Additionally, the terrorists strategically positioned themselves above a curve in the road where drivers were required to slow their vehicles, making the drivers more vulnerable targets. *Id*.

The large number of bullet casings found at the scene, the number of bullet wounds found on Yair Mendelson's body and the bullet damage to his car demonstrate that massive gunfire was directed at the civilian car. *Id*. Mr. Spitzen noted that in that period (1991), terrorist groups had great difficulty obtaining assault weapons like those used in the Mendelson Attack. *Id*. ¶ 23. These facts demonstrate the professionalism of the terrorist organization that carried out the attack. *Id*.

Mr. Spitzen concluded, on several bases, that the PFLP was the organization that carried out the Mendelson Attack. *Id*. ¶¶ 23-36. The Ballistics Telegram compares the results of the ballistics tests of the bullets fired in the March 26, 1991 Mendelson Attack and other contemporaneous terrorist attacks, and concludes that two of the machine guns used by the PFLP in another attack were also used in the attack in which Yair Mendelson was murdered. *Id*. ¶ 22, 29, and at Exhibit D (DE 51-5). Mr. Spitzen found it very significant that the same automatic weapons were used in another PFLP attack, because terrorist organizations in the West Bank did not share their

weapons with other organizations or unaffiliated individuals. *Id.* ¶ 23. Mr. Spitzen concluded that both terrorist attacks were carried by the PFLP, likely by members of the same PFLP cell. *Id.* ¶ 23.

The conclusions of the Ballistics Telegram are supported by the PFLP's own separate confirmations that it carried out both the Mendelson Attack and the second attack using the same weapons. *Id.* ¶¶ 25-28. In a front-page article published in the April 1991 edition of the PFLP's official publication, *The Revolution Continues*, the PFLP stated that it had carried out the "heroic operation" in Ein Qinya, killing one person. *Id.* ¶ 26, and at Exhibit C (DE 51-4). Mr. Spitzen states that the "PFLP operation at Ein Qinya" certainly refers to the March 26, 1991 attack, which was executed next to the village of Ein Qinya, at the "Ein Qinya Bend" in the road. *Id.* at ¶ 27. Additionally, the article states that the attack resulted in one death (like the Mendelson Attack), and the article was published only weeks after the Mendelson Attack. *Id.* ¶ 27. Moreover, no other terrorist attacks were carried out in that area during that time period. Nor did any other organization claim to have carried out the Mendelson Attack. *Id.* ¶ 35.

Mr. Spitzen concludes that in his expert opinion, given all the interlocking evidence, there is no reasonable doubt that the PFLP carried out the Mendelson Attack. *Id.* ¶¶ 31-36.

**D. Syria's Provision of Material Support to the PFLP Prior to the Mendelson Attack.**

*i.* *The Popular Front for the Liberation of Palestine*

The PFLP was founded in Lebanon in 1967 by individuals who sought to mobilize the working classes in Arab societies in the effort to destroy the State of Israel and replace it with a secular, Marxist-oriented Palestinian Arab government. Byman at 6-7; Levitt I (DE 49-2) at 1, 12. In its early years, the PFLP engaged in anti-imperialist guerrilla violence and terrorism directed at Israel. Byman at 7. However, the PFLP also opposed conservative Arab regimes such as Saudi Arabia and Jordan. Byman at 7.

The PFLP "earned a reputation for spectacular international attacks in the 1960s and 1970s, including airline hijackings that killed at least 20 U.S. citizens." Levitt I at 8-9; *Cf*. Byman at 9. Thanks to its high-profile, high-impact terrorist attacks, the PFLP gained considerable credibility among Palestinians. Byman at 10, Levitt at 8.

Viewing the Palestinian struggle as both an Arab liberation movement and a class struggle, the PFLP has maintained its goal of overthrowing Israel and moderate Arab states through force and violence. Levitt I at 7-8. The PFLP justifies its terrorist attacks against Israelis with the claim that Israeli civilians are really "military personnel in civilian clothes." Byman at 8.

In 1995, the U.S. Treasury Department designated the PFLP and its then-leader, George Habash, on its list of Specially Designated Terrorists. Levitt I at 14. In 1997, the State Department designated the PFLP as a Foreign Terrorist Organization. *Id*. It remains on both lists. *Id*. The PFLP has also been designated as a terrorist organization by Canada, the United Kingdom, the European Union, and Israel. *Id.* at 14-15.

ii. <u>*The Syria-PFLP Relationship*</u>

Syria has long played a critical role in funding and providing material support for the PFLP and its terrorist operatives. *Id*. at 1, 24. Beginning no later than the 1970s, Syria provided a wide array of material support to the PFLP. Byman at 17; Levitt I at 21. Syria's provision of material support to the PFLP in the years prior to the March 26, 1991 Mendelson Attack "directly contributed to the group's organizational and operational ability, circa 1991, to carry out such an attack." Levitt I at 25. Indeed, the Department of State's annual report on global terrorism stated that Syria provided weapons, operational bases, safe haven, and terrorist training facilities to the PFLP. *Id*. at 23. The sanctuary the PFLP enjoyed in Syria allowed it to coordinate its activities, organize, and otherwise operate with little interference. *Id*. Dr. Levitt cites a 1987 affidavit submitted by the

CIA's National Intelligence Officer for Counterterrorism, Charles E. Allen, affirming that "Syria is currently the PFLP's primary supporter." *Id*. at 23. And in 1994, most of the PFLP's financial assistance and military support came from Syria and Libya. *Id*. Thus, the material support provided by Syria to the PFLP in the years prior to the Mendelson Attack were key factors in the PFLP's ability to operate and carry out terrorist attacks in Israel, including the March 26, 1991 Mendelson Attack at issue here. Byman at 20 ("Syrian support was vital for the PFLP to be able to continue operations in Lebanon and in the West Bank.").

In the PFLP's first years, while sometimes supportive, the Syrian regime was, often suspicious of, or hostile towards, the PFLP. Byman at 7. However, since 1982, Syria has been the PFLP's primary state sponsor. Byman at 7. Syria's ruling Baath Party, led for the last five decades by President Hafez al Assad and his son, the current president, Bashar al-Assad, blends socialism with secular Arab nationalism. Byman at 3-4. As such, it shares a common ideological core with the Marxist PFLP. Byman at 3, 4, 7. The Syrian regime also saw in the PFLP an ally in their shared rejectionist positions against negotiations or relations with Israel. Byman at 5, 19.

Syria has viewed PFLP terrorist attacks against Israel as a means to harm, and to maintain pressure on, its neighbor, Israel. Byman at 9. Additionally, by enabling terrorist attacks by a proxy such as the PFLP, Syria was able to maintain a modicum of deniability. Byman at 9. Indeed, Dr. Byman notes that "[p]art of the reason Israel came to the negotiating table with Syria in the 1990s was that the Assad regime had the power to stop dangerous terrorist groups like Hezbollah and lesser groups like the PFLP, from attacking Israel." Byman at 9, 16. Dr. Levitt quotes from a May 1986 CIA intelligence report that observed: "Support for terrorist groups costs Syria little but raises the cost to participants of any peace initiative that excludes Damascus and serves to keep Assad's regional rivals off balance." Levitt I at 22. Therefore, the CIA report predicted that "Assad will

probably continue to encourage the selective use of terrorism when he believes it will advance his political fortunes." *Id*.

Hafez al-Assad, the father of Syria's current leader Bashar al-Assad, assumed control over both the Arab Socialist Baath Party and the Syrian government in 1969. Byman at 3-4. The Assads come from Syria's Alawi religious minority, which rendered them "suspect" in the eyes of a large segment of the Syrian population. *Id*. at 5. In line with their Baathist ideology, and in an effort to bolster the regime's base, both Bashar and Hafez al-Assad cultivated in Syria a pan-Arab identity and have encouraged Arab unity. *Id*. For the same reasons, the Assads made the struggle against Israel a key component of Syrian government policy. *Id*. at 5-6. Specifically, the Assad regime sought to cultivate ties with various terrorist organizations as a way to fight Israel and to boost the regime's legitimacy as leaders of the Arab world. *Id*. at 6; Levitt I at 22.

Until the early 1980s, Lebanon offered Palestinian terrorist groups a "front-line" base from which they could strike Israel. Byman at 8, 12-13. But for the PFLP to use Lebanon as a base, the organization needed the approval of Syria, which dominated Lebanon through, among other things, its massive military presence in that country. Byman at 13-14, 18. In 1982, the PFLP moved its headquarters to Syria, where it has remained until today. Byman at 19; Levitt I at 11.

In addition to safe haven, Syria has provided the PFLP with military training and military training facilities, weapons, operational bases, and funding. Byman at 8, 13, 20; Levitt I at 11, 23. Syrian hospitality allows the PFLP to coordinate its activities, organize, and otherwise operate with little interference. Levitt I at 23 (quoting Byman, "Confronting Syrian-Backed Terrorism," *The Washington Quarterly*, 28:3, pp. 99-113). Dr. Byman opines that "[w]ithout a headquarters in Syria, the PFLP leaders would have been far more vulnerable to Israeli raids or arrests by Arab

governments." Byman at 8. Moreover, Syrian training for PFLP forces made them more competent, and financial support enabled the group to retain its members and attract new ones. Byman at 8. The State Department's annual terrorism report for 1991 noted that the "PFLP receives most of its financial and military assistance from Syria and Libya." Levitt I at 12. Thus, at the time of the Mendelson Attack, Syria was the PFLP's primary sponsor.

Dr. Levitt explains the importance to the PFLP of Syrian state sponsorship. "The cost of running a terrorist group like the PFLP encompasses interdependent but separate operational, political, and management expenses." Levitt I at 24. The financial burdens of operating a terrorist organization are substantial. Operational costs include expenses for weapons and ammunition, explosive precursors, chemicals for bombs and poisoning, safe houses, communications, travel, transportation, bribes, intelligence payments, and training. *Id*. Moreover, terrorist organizations cannot function without political and social infrastructure, which also requires funding. Necessary political and social expenses include: propaganda, print collateral, and political campaigns in the political realm and salaries, overhead, payments to orphans and widows, education, health, and food in the social welfare service domain. *Id*. The political and social infrastructure serve the terrorist activities. *Id*.

Dr. Levitt further explains that while any given terrorist attack might be relatively inexpensive, an organization's ability to carry out any attack is dependent upon its maintenance of the financial and logistical support network that terrorists must draw upon to execute their attacks. *Id*. "Terrorist organizations incur many long-term costs, including renting safe houses, buying loyalties, maintaining the physical infrastructure of their networks, paying member salaries, printing posters and banners, and other costs." *Id*. at 25. Thus, former U.S. Treasury Undersecretary John

Taylor stressed the critical importance of cutting off terror financing: "Choking off funds that aid terrorists can lead to the ultimate ruin of terrorist organizations." *Id*.

In the years prior to the Mendelson Attack, Syria's extensive material support for the PFLP enabled the terrorist organization to grow and thrive. Syrian state support was critical to the PFLP's ability to carry out the Mendelson Attack. Byman at 1, 20; Levitt I at 1, 25.

## II. THE SHATSKY ATTACK (THE FEBRUARY 16, 2002, BOMBING)

### A. Expert Witnesses.

To establish Syria's liability for the February 16, 2002, bombing, Plaintiffs have submitted additional expert declarations from Dr. Levitt (DE 50-3) ("Levitt II") and Mr. Spitzen (DE 52-1) ("Spitzen II") [6], as well as the expert declaration of Dr. Jonathan Spyer. DE 50-2 ("Spyer).

As detailed in his declaration (DE 50-2) and curriculum vitae (DE 57), Dr. Spyer has more than two decades of experience and expertise as an analyst, researcher and author regarding Middle East political and security issues, with a specific focus on Syria and the PFLP. Spyer ¶¶ 1-8. Dr. Spyer has published extensively on these topics, and served as a director, fellow and researcher at numerous think tanks and research centers. *Id*.

As of 2020 (when his declaration was authored) Dr. Spyer had visited Syria approximately 15 times, and his expertise thus "has been gleaned not only from academic study of the country and these organizations over an extended period, but also from extensive experience in the field and on the ground in Syria, and with members and commanders of paramilitary organizations active in this arena, and with Syrian government officials." *Id*. ¶¶ 5-6. Similarly, he has personally

[6] Mr. Spitzen's declaration regarding the Shatsky Attack (DE 52-1) references his CV as being attached, but in the event the CV was accidently omitted when the declaration was filed. However, a copy of Mr. Spitzen's CV is attached to his declaration regarding the Mendelson Attack, DE 51-1 at pp. 14-17.

interviewed PFLP leaders and convicted PFLP terrorists. *Id*. ¶ 8. Dr. Spyer holds a PhD in International Relations from the London School of Economics, and a Masters degree in Middle East Politics from the School of Oriental and African Studies in London. *Id*. ¶ 1; DE 57.

**B. The Bombing.**

Mr. Spitzen provides the forensic details of the February 16, 2002, bombing, on the basis of documents contained in the Israeli police investigation file, including analysis from the police explosives laboratory, forensic and crime scene reports, photographs from the scene of the attack, pathology reports, police memoranda and court documents regarding a DNA identification of the bomber. *See* Second Declaration of Arieh Dan Spitzen (DE 52-1) ("Spitzen II") ¶¶ 18-21.

On February 16, 2002, shortly before 8:00 p.m., Sadeq Ahed Abd al-Hafez set off a powerful explosive device at a pizzeria located in the Karnei Shomron outdoor mall. The bomb, which had an electronic trigger powered by a 6-volt battery, consisted of a metal container wrapped with a large quantity of nails and metal scraps. The nails alone weighed more than 2.6 pounds. *Id*.

Because the bomb was attached to Abd al-Hafez's body and thus above floor level, and because he set off the bomb in the middle of the mall (which was crowded on a Saturday night), the impact and deadliness of the blast were magnified. The explosion killed Keren Shatsky, 15, who died at the scene; Rachel Thaler, 16, who died later of her injuries, and Nehemia Amar, 15, who was killed on the spot. More than twenty others were injured, some very seriously. *Id*.

As stated in the attached Declarations of Shabtai Scott Shatsky and Lior Thaler, the brutal murders of Keren Shatsky and Rachel Thaler as a result of the bombing caused their parents and siblings (all of whom are plaintiffs in this action) terrible, life-long grief and anguish, and permanent emotional and psychological scars. The bombing also caused plaintiffs Lior Thaler, Chana

(Friedman) Edri, Hillel Trattner and Steven Braun, who were all present at the scene of the bombing, severe physical and psychological injuries. *See* attached Declarations of Lior Thaler, Chana (Friedman) Edri, Hillel Trattner, and Steven Braun. And the direct injuries to Lior Thaler, Chana (Friedman) Edri and Hillel Trattner, caused their immediate family members (who are also plaintiffs here), severe emotional distress and other harm. *Id*.[7]

### C. The PFLP carried out the February 16, 2002, Bombing

There is no question that the Shatsky Attack was carried out by the PFLP. First, the bomber himself, 19 year-old Sadeq Ahed Abd al-Hafez, was a student activist in the PFLP. Spyer (50-2) ¶ 11; Spitzen II (52-1) ¶ 33. Furthermore, the published results of an official investigation conducted by the Israel Security Agency ("ISA"), which is the Israeli government agency responsible for preventing and investigating terrorist attacks in Israel and the West Bank, concluded that the February 16, 2023 bombing, "was planned and executed by the PFLP military network in Qalqilya, under the direction of Raad Madi, in collaboration with the PFLP network in Nablus, headed by Ahad Oulma." Spitzen II ¶¶ 44. *Cf*. Spyer ¶ 11 (same).

Thus, the official Israeli government investigation of the bombing not only determined that it was carried out by the PFLP, but was able to pinpoint the two specific PFLP cells (*i.e.*, those in the cities of Qalqilya and Nablus), which had planned and executed the bombing.[8]

---

[7] As noted above, while Plaintiffs have submitted declarations for the limited purpose of establishing (as elements of subject-matter jurisdiction and liability) the U.S. citizenship of the claimants and the victims, and the fact that they suffered some harm as a result of the attacks from which this action arises, these declarations are not intended to prove the extent or quantum of Plaintiffs' damages. Plaintiffs will submit full and detailed evidence of their damages, at the damages stage.

[8] Both Mr. Spitzen and Dr. Spyer explain why they believe the ISA report is extremely reliable. Spitzen II ¶¶ 45-48; Spyer ¶ 11 n.5. Expert witnesses such as Mr. Spitzen and Dr. Spyer may rely on materials that are not themselves admissible. Fed. R. Evid. 703. However, the Shatsky Plaintiffs prefer to take a belt-and-suspenders approach, and have therefore also submitted the Declaration of Itzhak Ilan, formerly the Deputy

(Cont'd on following page)

The PFLP itself confirmed repeatedly that it carried out the bombing. The PFLP published on its official website the very evening of the bombing (which as noted, occurred around 8 p.m.) a detailed communiqué that, among things, confirmed that the PFLP had perpetrated the bombing, which it termed "a heroic operation," and stated that the bomber, Abd al-Hafez, was a PFLP operative, and compared him to the Marxist revolutionary Ernesto "Che" Guevara. Spitzen II at ¶ 24, and at Ex. A. The publication of this detailed official communiqué immediately after the bombing "indicates that the senior PFLP leadership had prior knowledge of the attack. Given the disciplined, hierarchical structure of the PFLP, it is very likely that this suicide attack was specifically authorized in advance by the organization's top leaders." *Id*. ¶ 25.

Additionally, the February 2002 edition of the PFLP's official print magazine, ***Al Hadaf***, contained multiple items confirming that the PFLP had executed the Shatsky Attack, including:

- A large color memorial portrait of Sadeq Abd al-Hafez with the caption "The Popular Front for the Liberation of Palestine escorts its heroic self-sacrificing martyr Sadeq Ahed Abd Al-Hafez [to his celestial wedding]." *Id*. ¶ 32.
- A second picture of Abd al-Hafez, alongside the PFLP logo, with a caption describing him a "martyr" and as a "comrade" (a special honor in the Marxist PFLP). *Id*. ¶ 27.
- Messages of congratulations to Abd al-Hafez's family from both George Habash, the founder of the PFLP, and PFLP Secretary-General Ahmad Sa'adat. *Id*. ¶¶ 28-30.

All these materials, with translations into English, are attached to Spitzen II as Exhibits B-D.

---

Head of the ISA, in order to provide an independent evidentiary foundation for the ISA report. (DE 50). The facts set forth in Mr. Ilan's Declaration regarding the investigatory and fact-finding processes that generated the findings contained in the ISA report, establish that those findings are independently admissible under Fed. R. Evid. 803(8)(A) as "factual findings from a legally authorized investigation" and/or as "a matter observed while under a legal duty to report."

As Mr. Spitzen explains: "Coming from the legendary founder and historical leader of the PFLP (Habash), and its serving Secretary-General (Sa'adat), expressions of congratulations to a terrorist's family regarding a terror attack … is no everyday occurrence. The presentation of such congratulations and the reference to Abd al-Hafez using PFLP/Marxist terminology [such] as 'vanguard comrade' in the PFLP's main organ, a political publication par excellence distributed and read primarily among the organization's leaders, operatives and supporters, can leave no reasonable doubt that the Karnei Shomron bombing was executed by the PFLP." *Id.* ¶ 31.

Moreover, as Mr. Spitzen further discusses, in the two decades since the bombing the PFLP has repeatedly confirmed, through its official publications, activities, and leaders, that Abd al-Hafez was a PFLP operative and the bombing was carried out by the PFLP. *Id.* ¶¶ 33-36. Mr. Spitzen also explains why, in his expert opinion and experience, there is no reason to doubt these cumulative statements. *Id.* ¶¶ 36-42.

In sum: "There is broad consensus that the PFLP carried out the February 16, 2002, bombing attack at a pizza parlor in which Keren Shatsky and Rachel Thaler were murdered, and Leor Thaler, Hillel Trattner, Ronit Trattner, Steven Braun, and Chana Friedman were injured." Levitt II (DE 50-3) at 1. *Cf. id.* at 5-7 (citing inter alia the U.S. State Department).

**D. Syria's Provision of Material Support to the PFLP Prior to the Shatsky Attack.**

As discussed above in Part I(D), during the years prior to the Mendelson Attack in 1991, Syria provided the PFLP with a wide range of material support and resources, which enabled the PFLP to carry out terrorist attacks such as that in which Yair Mendelson was murdered.

Dr. Levitt and Dr. Spyer explain that Syria's provision of material support and resources to the PFLP—including funding, training, logistical support and a geographical basis from which to operate safely—continued apace in the 11 years between the Mendelson Attack and the Shatsky

Attack. As Dr. Levitt explains, "Syrian funding goes a long way towards helping the PFLP bear the significant financial burden of underwriting its operations. … Syria's provision of a safe haven to the PFLP—where it was able to maintain headquarters for its leadership and operate freely—helped facilitate the group's terrorist attacks. Syrian support for the PFLP, therefore, has been critical to the group's ability to carry out its terrorist activities. … the PFLP carried out the February 16, 2002, bombing attack … Syria's decades-long provision of material support to the PFLP in the years prior to that attack directly contributed to the group's organizational and operational ability, circa 2002, to carry out such a terrorist attack." Levitt II (DE 50-3) at 39-40.

Similarly, Dr. Spyer states that, the PFLP "was during the two decades prior to the [February 16, 2002] attack headquartered in Syria. In the context of maintaining its base and command center in Syria, the organization benefitted from safe harboring, logistical support, and training facilities on Syrian soil, maintained with the permission of the Syrian government. … [S]hould the government of Syria have wished to have prevented the bombing campaign conducted by the PFLP in the West Bank and Israel during the Second Intifada, which included the Karnei Shomron attack of February 16, 2002, carried out by an infrastructure commanded and ultimately financed from Syrian soil, it could have done so. … [T]he Syrian government made possible the Karnei Shomron attack through its domiciling and logistical support for the PFLP structure which carried it out, a structure managed and directed from Syrian soil." Spyer (DE 50-2) at ¶¶ 38, 41, 43.

Additionally, Dr. Spyer highlights the important role played by PFLP's headquarters in Syria during the period of intensive terrorist violence between 2000-2005, known as the "Second Intifada," in the context of which the Shatsky Attack was carried out. "[W]ith the outbreak of the Palestinian insurgency in late 2000, the military command center in Syria was responsible for directing the activity of the PFLP's terror cells … the command center in Damascus, maintained

by senior PFLP operatives such as Daud Mara'a and Abu Ahmed Fuad (who today leads the movement, from Damascus) played and plays the central role in the direction of terror activities. For obvious security reasons, the PFLP wishes to keep this structure as safe as possible from Israeli attention and disruption. The ability to operate from Syria makes this possible." *Id*. at ¶ 37. *Cf. id*. at ¶ 34 (discussing the "direct planning of terrorist activities by the PFLP [that] took place in Syria during the period of the Second Intifada.").

**DISCUSSION**

A plaintiff seeking a default judgment under the FSIA must present "evidence satisfactory to the court" of both jurisdiction and liability. *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 44 (D.D.C. 2019) ("The FSIA permits entry of default judgment against where plaintiffs prove jurisdiction and liability 'by evidence satisfactory to the court.' 28 U.S.C. § 1608(e).").

As this Court has explained, "[d]efault judgment is appropriate when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding. Where a plaintiff invokes the FSIA's terrorism exception, as plaintiffs do here, courts must be mindful that Congress enacted that exception with the aim to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability. Indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Fields*, 2021 WL 9244135, at *5-6. (cleaned up).

As discussed below, the Plaintiffs here have easily established both jurisdiction and liability.

**A. The Court Has Subject Matter Jurisdiction Over This Action**

**1. The Elements of Subject Matter Jurisdiction.**

Pursuant to 28 U.S.C. § 1330(a), district courts have subject matter jurisdiction over any non-jury civil action against a foreign state as to any claim for relief for which the foreign state is

not immune under the FSIA. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002). This is a non-jury civil action against Syria, a foreign state. Thus, subject-matter jurisdiction turns on whether Syria enjoys immunity under the FSIA. It does not.

The Plaintiffs bring their claims under 28 U.S.C. § 1605A, the "Terrorism Exception" to foreign sovereign immunity. Section 1605A(a) provides in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of … extrajudicial killing … or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

§ 1605A(a)(1).

This Court has summarized the elements of § 1605A: "The terrorism exception applies when money damages are sought (1) from a 'foreign state that was designated as a state sponsor of terrorism at the time of the act' giving rise to the suit, (2) where either 'the claimant or the victim was' 'a national of the United States,' (3) after 'the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim' if 'the act occurred in the foreign state against which the claim has been brought,' (4) to compensate the claimant for 'for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,' by foreign officials acting in their official capacity. *Fields*, 2021 WL 9244135, at *6 (cleaned up).[9]

[9] Since the third requirement – affording the state defendant an opportunity to arbitrate the claim – applies only where damages are sought for an "act that occurred in the foreign state against which the claim has been brought," it is not relevant here.

### 2. The Elements of Subject Matter Jurisdiction Are Satisfied.

The elements of subject-matter jurisdiction are all easily met here:

***First***, the Plaintiffs seek money damages against Syria, which has been a designated state sponsor of terrorism continuously since 1979. *Gates v. Syrian Arab Republic*, 646 F.3d 1, 2 (D.C. Cir. 2011) ("Syria has been designated a state sponsor of terrorism since 1979."). *Cf*. State Sponsors of Terrorism, U.S. Department of State, https://www.state.gov/j/ct/list/c14151.htm (Syria designated on December 29, 1979).

***Second***, all but two of the Plaintiffs are U.S. nationals. *See* Declarations of Miriam Miller Itay and Elizabeth Har Zahav (DE 59-60), and the attached Declarations of Shabtai Scott Shatsky, Lior Thaler, Chana (Friedman) Edri, Hillel Trattner and Steven Braun.

Plaintiffs Ginette Thaler and Ronit Trattner are not U.S. nationals. However, as noted above, § 1605A creates subject-matter jurisdiction where either the claimant or the **victim** was a U.S. national. *Fields*, *id*. This Court has subject-matter jurisdiction over the claims of plaintiff Ginette Thaler because she is the mother of two U.S. national victims: Ginette's daughter, decedent Rachel Thaler, who was a U.S. national, was murdered in the bombing; and Ginette's son, plaintiff Lior Thaler, who was severely injured in the bombing, is also a U.S. national. *See* Thaler Decl., *passim*. Likewise, this Court has subject-matter jurisdiction over the claims of plaintiff Ronit Trattner because she is the spouse of Hillel Trattner, a U.S. national who was severely injured in the bombing. Trattner Decl., *passim*.[10] *Cf. Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 369 (D.D.C. 2020) (§ 1605A provided subject-matter jurisdiction over claims of "non-U.S. national (Israeli national) plaintiffs," whose American family members were injured in a terrorist

[10] While the Court has subject-matter jurisdiction over the claims of Ms. Thaler and Ms. Trattner under § 1605A, the federal cause of action provided by § 1605A(c) is available only to a U.S. national. Accordingly, as discussed below, Ms. Thaler and Ms. Trattner assert their claims under non-federal (*i.e.* Israeli) law.

attack, "because the waiver of foreign sovereign immunity applies so long as 'the claimant *or* the victim was, at the time of the' terrorist attack, a U.S. national") (emphasis in the original).

***Third***, Plaintiffs seek damages for personal injuries and death that were caused by the "extrajudicial killings" of Yair Mendelson, Keren Shatsky and Rachel Thaler, and by Syria's provision, through its officials, employees, and agents, of material support and resources for such extrajudicial killings. Section 1605A adopts the definition of "extrajudicial killing" codified in the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note ("TVPA"). 28 U.S.C. § 1605A(h)(7). The TVPA defines "extrajudicial killing" as:

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350.

The D.C. Circuit has explained that "this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. The two attacks from which this action arises satisfy all three elements, and "do[] not fall within the exception for killings carried out under the authority of a foreign nation acting in accord with international law." *Id*.

The terrorist attacks here killed Yair Mendelson, Keren Shatsky and Rachel Thaler, and those killings were obviously "deliberated." "A 'deliberated' killing is simply one undertaken with careful consideration, not on a sudden impulse." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 83 (D.D.C. 2018) (citations omitted). As detailed in Mr. Spitzen's declarations, both the 1991 shooting attack and the 2002 bombing attack were well-planned, professionally-executed attacks. Those attacks were not "authorized by a previous judgment pronounced by a regularly constituted

court." Thus, there is no question that the murders of Yair Mendelson, Keren Shatsky and Rachel Thaler were extrajudicial killings within the meaning of § 1605A. *Cf. Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 134 (D.D.C. 2018). ("Clearly, this killing was not authorized by a prior judgment affording judicial guarantees or due process, nor is such deliberate killing lawful under any international law. It is a quintessentially extrajudicial killing.").

***Fourth***, Syria provided the PFLP with "material support and resources" for such attacks. "Material support or resources" is a defined term under the FSIA's terrorism exception. Section 1605A(h)(3) incorporates the definition provided under 18 U.S.C. § 2339A(b)(1), namely:

> the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials

18 U.S.C. § 2339A(b)(1).

As this Court has found, "where a foreign government's support of terrorist activities could be shown generally, plaintiffs need not prove whether the government had provided material support and resources that caused *this particular act*. *Est. of McCarty v. Islamic Republic of Iran*, No. CV 19-853 (RJL), 2020 WL 7696062, at *4 (D.D.C. Dec. 28, 2020) (cleaned up) (emphasis in the original) (citing *Owens*, 864 F.3d at 794-99 (finding causation where defendant-Sudan provided safe harbor and preferential tax treatment to al Qaeda, despite Sudan's ignorance of al Qaeda's specific plans to launch attacks on U.S. embassies in Africa)).

In other words, § 1605A does not require plaintiffs prove that their injuries would not have happened "but for" the defendant's actions. *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004). Neither must they establish a close temporal or spatial

proximity between the harm and the action that caused it. *Rux v. Republic of Sudan*, 461 F.3d 461, 473 (4th Cir. 2006), *citing Kilburn*, 376 F.3d at 1128. Rather, proximate causation under §1605A is established by demonstrating "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens*, 864 F.3d at 794. "To establish a 'reasonable connection,' Plaintiffs must show both that the defendant's actions were a substantial factor in the sequence of events that led to their injury and that their injury must have been reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 61 (D.D.C. 2021) (cleaned up).

This "substantial factor in the sequence of events" requirement is satisfied when the material support significantly boosted the terror group's operational capacities. *Id*. (finding proximate causation satisfied because the Taliban would have been "a less lethal and effective fighting force without Iranian support" and it was "enough for Plaintiffs to have shown that Iran's financial and military aid to the Taliban played a significant role in aiding its operational capacity.") (cleaned up). *Cf. Schwartz v. Islamic Republic of Iran*, 2020 WL 7042842, at *14 (D.D.C. Nov. 30, 2020) (finding proximate cause satisfied because "financial support and material aid are fungible and … Iranian support helped make Hamas the force that it was in November 2015 … it is enough for Plaintiffs to have shown that Iran's financial and military aid to Hamas played a significant role in aiding its operational capacity. It is uncontested that Iran provided material support to Hamas for nearly two-and-a-half decades.")

The material support element of § 1605A is easily satisfied here. As discussed in detail in the declarations of Dr. Levitt, Dr. Byman and Dr. Spyer, during the decades prior to the two attacks at issue in this case, Syria provided the PFLP with a broad range of material support and resources.

That support enabled the PFLP to survive and thrive, and significantly enhanced the PFLP's operational capabilities to carry out the two terror attacks at issue here. "Without the significant funding it needs to carry out its terrorist, political, and other activities—which are interdependent and mutually reinforcing endeavors—a terrorist group like the PFLP could not function. Syria… plays a critical role in funding, providing material support for the PFLP and its terrorist operatives. … Syria's provision of a safe haven to the PFLP—where it was able to maintain headquarters for its leadership and operate freely—helped facilitate the group's terrorist attacks. … Syria's decades-long provision of material support to the PFLP in the years prior to the March 26, 1991, attack in which Yair Mendelson was killed, directly contributed to the group's organizational and operational ability, circa 1991, to carry out such a terrorist attack." Levitt I (DE 49-2) 24-25. *Cf.* Byman (DE 49-1) at 20 ("Without Syria's assistance and support , the PFLP would have been weaker and less able to carry out deadly terrorist attacks. In particular, the sanctuary in Syria and other support enabled the PFLP to recruit, plan operations, train its forces, protect its leadership, and otherwise maintain itself. … without Syrian support the PFLP would likely have lost recruits and funding to rivals and would otherwise have declined, and that decline in turn would make it less effective … decreasing its appeal. Syrian support was vital for the PFLP to be able to continue operations in Lebanon and in the West Bank. Without Syrian support, it would have been far harder for the PFLP to carry out terrorist attacks such as the one that killed Yair Mendelson in 1991."); Spyer (DE 50-2) at ¶¶ 38, 41, 43 ("The Popular Front for the Liberation of Palestine, which carried out the attack at the Karnei Shomron mall on February 16, 2002, was during the two decades prior to the attack headquartered in Syria. In the context of maintaining its base and command center in Syria, the organization benefitted from safe harboring, logistical support, and training facilities on Syrian soil, maintained with the permission of the Syrian government. … [S]hould the government

of Syria have wished to have prevented the bombing campaign conducted by the PFLP in the West Bank and Israel during the Second Intifada, which included the Karnei Shomron attack of February 16, 2002, carried out by an infrastructure commanded and ultimately financed from Syrian soil, it could have done so. It clearly chose not to do so. … [T]he Syrian government made possible the Karnei Shomron attack through its domiciling and logistical support for the PFLP structure which carried it out, a structure managed and directed from Syrian soil. The Syrian government permitted the PFLP to carry out the bombing campaign of which the Karnei Shomron attack was a part."); Levitt II (DE 50-3) at 39-40 ("Syrian funding goes a long way towards helping the PFLP bear the significant financial burden of underwriting its operations. … Syria's provision of a safe haven to the PFLP—where it was able to maintain headquarters for its leadership and operate freely—helped facilitate the group's terrorist attacks. Syrian support for the PFLP, therefore, has been critical to the group's ability to carry out its terrorist activities. … There is broad consensus that the PFLP carried out the February 16, 2002, bombing attack … Syria's decades-long provision of material support to the PFLP in the years prior to that attack directly contributed to the group's organizational and operational ability, circa 2002, to carry out such a terrorist attack.").

Thus, the very extensive, all-encompassing Syrian support for the PFLP was an extremely substantial factor in the sequence of events leading to the attacks at issue in this action.

Moreover, those attacks were also a reasonably foreseeable and anticipated consequence of Syria's material support of the PFLP, given that the very purpose of that support was to encourage and enable the PFLP to engage in terrorist attacks. *Cf.* Byman at 9 ("The PFLP regularly attacked Israel, which Syria saw as a way to keep pressure on the Jewish state. In addition to pioneering airplane hijacking, PFLP personnel conducted guerrilla attacks and cross-border raids and also often worked with other groups on their operations against Israel. The PFLP also used its local

networks to attack Israelis in Israel and the West Bank. Such attacks hurt Assad's enemy, Israel.") (citations omitted); Spyer ¶ 42 ("There is no need for speculation regarding the Syrian government's attitude regarding the attacks carried out by the PFLP and other Palestinian terror organizations in Israel and the West Bank at this time. As revealed in statements quoted above, including by Syrian President Bashar Assad during the same period as the Karnei Shomron attack, the Syrian authorities supported and approved of these attacks, and did not regard them as terrorism.").

***Fifth***, Syria provided the material support and resources to the PFLP through its officials, employees and agents acting within the scope of their office, employment, and agency. § 1605A. The cooperation between Syria and the PFLP was a matter of Syrian government policy and was being directed from the highest levels of the Syrian government. "Syrian material support for the PFLP was conducted through its Ministry of Defense, intelligence ministries, and military services, acting in their official capacities and with approval from Assad and other senior leaders. …the Syrian Ministry of Defense, Syrian Air Force, and the General Intelligence Directorate backed a range of terrorist activity." Byman at 11. *Cf.* Spyer ¶ 30 ("A number of organizations and individuals in Syria have been responsible for the maintenance and management of the regime's relationship with the PFLP over the years, pursuant to the official policy of the regime. The powerful Military Intelligence Directorate has had responsibility for managing the support afforded the Syrian regime to terrorist and paramilitary organizations, including the PFLP. The commander of Military Intelligence at the time of the Karnei Shomron attack was Major-General Hassan Khalil. His deputy was Assef Shawkat, the brother in law of President Bashar al-Assad. … Syrian Air Force Intelligence, headed in 2002 by Ali Mamlouk, who is now Syria's most senior official in the intelligence field, also has direct links to Palestinian terror groups."); Levitt II (DE 50-3) at 37-38

(the deputy director of Syrian Military Intelligence was "charged with overseeing liaison relationships with major terrorist groups resident in Damascus, including the PFLP") (cleaned up).

***

Based upon the foregoing, the Court has subject-matter jurisdiction over this action.

**B. The Court Has Personal Jurisdiction Over Syria**

Personal jurisdiction over a foreign state defendant exists as to every claim for which the district court has subject matter jurisdiction so long as service has been made under 28 U.S.C. § 1608. 28 U.S.C. § 1330(b); *GSS Grp. Ltd. v. Nat'l Port Auth.*, 680 F.3d 805, 811 (D.C. Cir. 2012); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002). Moreover, "[t]he jurisdictional protections of the Due Process Clause do not apply to 'foreign states and their instrumentalities.'" *Price,* 294 F.3d at 87 (foreign states are not "persons" entitled to due process). Thus, by demonstrating the Court's subject matter jurisdiction and proper service, the Plaintiffs have established that the Court may assert personal jurisdiction over Syria.

**C. Syria's Liability Has Been Established**

As set forth below, Syria's liability for the Plaintiffs' injuries has also been established.

**1. Liability Pursuant to FSIA § 1605A(c).**

The First Count set forth in Plaintiffs' complaint is the federal cause of action for damages under § 1605A(c). DE 1 at ¶¶ 69-81. This federal cause of action is available to "a national of the United States." § 1605A(c)(1). As discussed above, all but two of the Plaintiffs here are U.S. nationals who are entitled to recover under § 1605A(c). *See* Declarations of Miriam Mendelson Miller and Elizabeth Har Zahav (DE 59-60), and the attached Declarations of Shabtai Scott Shatsky, Lior Thaler, Chana (Friedman) Edri, Hillel Trattner and Steven Braun.

Notably, "[t]here is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity.'" *Fritz*, 320 F. Supp. 3d at 86 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)); *see also Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 59 (D.D.C. 2019). Therefore, "liability under § 1605A(c) exists whenever the jurisdictional requirements of § 1605A(a)(1) are met." *Khosravi v. Gov't of Islamic Republic of Iran*, 2020 WL 4923495, at *5 (D.D.C. Aug. 21, 2020). *Cf. Fritz*, 320 F. Supp. 3d at 86 ("a plaintiff that offers proof sufficient to establish an exception to foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law [under § 1605A(c)]."); *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) ("Essentially, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A(a)(1) are met.").

Thus, because this Court has subject-matter jurisdiction over this action under § 1605A (as shown above), the Plaintiffs herein who are U.S. nationals are entitled to relief under § 1605A(c).

However, "Section 1605A(c) does not specify the substantive bases for liability that determine plaintiffs' entitlement to damages. Consequently, courts may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Blank v. Islamic Republic of Iran*, 2021 WL 3021450, at *9 (D.D.C. July 17, 2021) (cleaned up). Thus, courts have found that § 1605A(c) allows claims for civil conspiracy, wrongful death, battery, assault, solatium, intentional infliction of emotional distress (IIED), and civil conspiracy, among others. *Cf. Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 101 (D.D.C. 2017) (civil conspiracy, assault, battery); *Selig*, 573 F. Supp. 3d at 63 (wrongful death, solatium and IIED); *Schooley v. Islamic Republic of Iran*, 2019 WL 2717888, at *71 (D.D.C. June 27, 2019) (assault, battery and IIED).

Syria is liable under § 1605A(c)[11] based upon the following theories of liability:

**Civil Conspiracy**

Judges of this Court have repeatedly held that "sponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Gill*, 249 F. Supp. 3d at 101; *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 21-22 (D.D.C. 2009) (same); *Acosta v. The Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26-27 (D.D.C. 2008) (same); *Bodoff v. Islamic Republic of Iran*, 424 F.Supp.2d 74, 84 (D.D.C. 2006) (same); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998) (same). The extensive support Syria provided to the PFLP, knowing the PFLP's violent policies and activities, demonstrate that Syria conspired with the PFLP to carry out terrorist activities such as the attacks at issue here.

Indeed, as both Dr. Byman and Dr Spyer explain in detail, during the decades prior to the two attacks at issue here, Syria provided the PFLP with a safe base of operations in Syria (and in Syrian-controlled areas of Lebanon), and a broad range of other types of material support, in order to enable the PFLP to carry out terrorist attacks against Israel—which attacks in turn advanced and realized Syria's own policy goals in multiple ways. Byman at 6-15, 20; Spyer ¶¶ 21-24, 26, 32, 37, 40, 42-43. In other words, the relationship between Syria and the PFLP was in essence an agreement by two actors to achieve mutually beneficial and unlawful goals—which is the very essence of a civil conspiracy. Thus, Syria is liable to Plaintiffs as a co-conspirator of the PFLP.

**Wrongful Death**

Wrongful death claims are, unfortunately, common bases for liability in actions under § 1605A(c), and are available where, as here, the foreign state defendant provided material support

[11] The following discussion is focused on Syria's liability for the attacks. Evidence of the specific categories and the extent of the damages caused to each of the Plaintiffs under these various theories of liability will be presented at the damages phase.

to the terrorist group that murdered the decedent. "Plaintiffs may recover for wrongful death upon establishing that Iran caused decedents' deaths. Because the Court has already determined that Plaintiffs have submitted satisfactory evidence showing that the decedents' deaths were extrajudicial killings caused by the Taliban and the Haqqani network with support from Iran and the IRGC, Plaintiffs have satisfactorily pled a wrongful death theory of liability." *Selig*, 573 F. Supp. 3d at 63 (cleaned up). *Cf. Ben-Yishai v. Syrian Arab Republic*, 2022 WL 17250344, at *9 (D.D.C. Nov. 28, 2022) ("plaintiffs have presented satisfactory evidence that Shoshana's untimely death was the result of a killing perpetrated by the PIJ. Because the defendants materially supported the PIJ in carrying out the attack, they are liable to Shoshana's estate."). (cleaned up).

Because Plaintiffs have shown that Syria provided extensive material support to the PFLP, which murdered Yair Mendelson, Keren Shatsky and Rachel Thaler, Syria is liable for the wrongful deaths of these decedent pursuant to § 1605A(c). "Because Defendants are liable for the deaths of Thomas DiBenedetto, Lex Trahan, Steven Forrester, and Mark Payne arising out of the bombing on the Marine barracks, Plaintiffs have proven the validity of their wrongful death theory." *DiBenedetto v. Iranian Ministry of Info. & Sec.*, 2019 WL 4860778, at *7 (D.D.C. Sept. 30, 2019).

**Survival Damages**

In the FSIA context, "survival actions allow for the awarding of damages for the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter." *Ben-Yishai*, 2022 WL 17250344, at *10 (cleaned up). However, to succeed on a survival claim, "a plaintiff must show that the decedent's death was anything but instantaneous. Therefore, to the extent that Plaintiffs are able to demonstrate to the special master that Thomas DiBenedetto, Lex Trahan, Steven Forrester, and Mark Payne did not die instantaneously, they are entitled to recovery." *DiBenedetto*, 2019 WL 4860778, at *7.

Plaintiffs will submit evidence at the damages phase proving that the deaths of Keren Shatsky and Rachel Thaler were not instantaneous, that they suffered conscious pain before dying, and that the estates of these decedents should therefore be awarded survival damages.

**Battery**

As set forth in their attached declarations, Plaintiffs Hillel Trattner, Lior Thaler, Chana (Friedman) Edri and Steven Braun were all present and physically injured in the Shatsky Attack. To maintain a § 1605A(c) claim under a theory of battery, "Plaintiff must show that Defendants acted intending to cause a harmful or offensive contact, or an imminent apprehension of such a contact and a harmful contact with those attacked directly or indirectly resulted. Harmful contact results when there is any physical impairment of the condition of another's body, or physical pain or illness." *DiBenedetto*, 2019 WL 4860778 at *7 (cleaned up). Moreover, "[A]cts of terrorism, are, by their very nature, intended to harm and to terrify by instilling fear of such harm." *Id*.

The declarations of Hillel Trattner, Lior Thaler, Chana (Friedman) Edri and Steven Braun establish their battery claims. Thus, Syria is liable to these defendants for battery.

**Assault**

To prevail under a theory of assault, a plaintiff "must establish that Defendants intended to cause a harmful or offensive contact with, or an imminent apprehension of such a contact and as a result put Plaintiffs in imminent apprehension." *DiBenedetto*, 2019 WL 4860778 at *8 (cleaned up). As set forth in her declaration, Plaintiff Elizabeth Har Zahav arrived at the scene of the Mendelson Attack immediately after it occurred, feared for her own life and the lives of her children and mother-in-law who were sitting in her car, and realized that the terrorists could still be lurking and that she was in grave danger. DE 60, *passim*. These facts establish Ms. Har Zahav's assault

claims. "[A]cts of terrorism are, by their very nature, intended … to terrify by instilling fear of further harm." *DiBenedetto*, *id*.

**Intentional Infliction of Emotional Distress**

All the U.S.-national Plaintiffs have a claim against Syria for international infliction of emotional distress ("IIED"). "Syria is liable for IIED if, through the provision of material support, it by extreme and outrageous conduct intentionally or recklessly caused severe emotional distress." *Est. of Parhamovich v. Syrian Arab Republic*, 2021 WL 6843587, at *14 (D.D.C. June 23, 2021). That is exactly what Syria did here, by providing material support and resources to the PFLP, which carried out the attacks from which this action arises. Indeed, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin*, 667 F. Supp. 2d at 22.

Notably, "Plaintiffs may state a claim for IIED even though they were not present at the attack." *Parhamovich*, 2021 WL 6843587, at *14. And the non-present, immediate family members of an injured terrorism victim may recover for IIED even where their injured relative survives. *Cf. Aceto v. Islamic Republic of Iran*, 2020 WL 619925, at *16 (D.D.C. Feb. 7, 2020) (non-present parents, siblings, spouses, and children of injured victims awarded damages for IIED); *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 123 (D.D.C. 2012) (same).

As set forth in the Plaintiffs' declarations, all the Plaintiffs in this action were either themselves harmed at the scene of the attacks, and/or are the immediate family members of other plaintiffs who were injured, and/or the three decedents who were killed, in the attacks, and—unsurprisingly—all the Plaintiffs suffered emotional distress as a result. Therefore, Syria is liable for IIED.

**2. Liability to Ginette Thaler and Ronit Trattner Pursuant to Israeli Law**

As noted above, plaintiffs Ginette Thaler and Ronit Trattner are not U.S. nationals, and are therefore unable to recover under the federal cause of action provided in § 1605A(c). However, non-U.S. national family members of U.S. citizens killed or injured in terrorist attacks may recover in an FSIA § 1605A suit, under applicable non-federal causes of action. "[A]lthough those plaintiffs who are foreign national family members of victims of the terrorist attacks in Beirut lack a federal cause of action, they may continue to pursue claims under applicable state and/or foreign law. This is so because section 1605A's creation of a new cause of action did not displace a claimant's ability to pursue claims under applicable state or foreign law upon the waiver of sovereign immunity." *Barry*, 437 F. Supp. 3d at 46 (cleaned up).

Judges of this Court have repeatedly held that under the District of Columbia's choice-of-law principles, Israeli law applies to the claims of non-U.S. nationals who are plaintiffs in FSIA actions arising from terrorist attacks in Israel. *See e.g. Henkin v. Islamic Republic of Iran*, 2021 WL 2914036, at *5-7 (D.D.C. July 12, 2021); *Force* , 464 F. Supp. 3d at 373.

Accordingly, Plaintiffs' complaint (DE 1) sets forth causes of action under Israeli law for assault and battery (*id.* ¶¶ 100-115), negligence (*id.* ¶¶ 143-153), aiding and abetting and civil conspiracy (*id.* ¶¶ 154-165), and vicarious liability/respondeat superior (*id.* ¶¶ 166-177).

As explained in detail in the attached Declaration of Dr. Boaz Shnoor, an expert on Israeli tort law, plaintiffs Ginette Thaler and Ronit Trattner are entitled to recover against Syria under Israeli tort law for negligence (which in Israeli law includes intentional conduct), vicarious liability, aiding and abetting, and civil conspiracy. *Id.* ¶¶ 8-41. Judges of this court have found Syria (and Iran) liable under these same Israeli torts, in similar circumstances. *Cf. Force*, 464 F. Supp. 3d at 374-375 (finding Syria and Iran liable for negligence under Israeli law for sponsoring terrorist attacks in Israel); *Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15, 38-40 (D.D.C. 2022)

(same, under Israeli aiding and abetting principles); *Henkin*, 2021 WL 2914036, at *8-9 (same, under Israeli vicarious liability principles).

In sum, Plaintiffs have established Syria's liability for the 1991 and 2002 attacks.

## CONCLUSION

This Court has subject-matter jurisdiction over this action and personal jurisdiction over Syria, and Syria's liability for the two terrorist attacks that harmed the Plaintiffs herein has been established, pursuant to FSIA § 1605A(c) and under relevant Israeli law.

**WHEREFORE**, Plaintiffs respectfully request that the Court (i) enter judgment on liability against Syria; (ii) refer the matter of Plaintiffs' damages to a Special Master appointed pursuant to 28 U.S.C. § 1605A(e); and then, after reviewing the Special Master's damages report and recommendations, (iii) enter final judgment by default against Syria.

Dated: February 21, 2023

Respectfully submitted,

WINSTON & STRAWN, LLP

By _/s/ Abbe David Lowell_

A Member of the Firm

1901 L Street, N.W.
Washington, DC 20036
Tel: (202) 282-5875
adlowell@winston.com

NORTON ROSE FULBRIGHT

Joy L. Langford
901 H Street, N.W.
Washington, DC 20036
Tel: (202) 974-5605
joy.langford@nortonrosefulbright.com

*Counsel for the Shatsky Plaintiffs*

LAW OFFICE OF ASHER PERLIN

By /s/ Asher Perlin

4600 Sheridan Street, Suite 303
Hollywood, Florida 33021
Tel: (786) 233-7164
asher@asherperlin.com

*Counsel for Mendelson Plaintiffs*